# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 5, 2011 Session

## TIMMY SYKES ET AL. V. CHATTANOOGA HOUSING AUTHORITY ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Hamilton County**
**No. 05C556      W. Jeffrey Hollingsworth, Judge**

---

**No. E2008-00525-SC-R11-CV - Filed June 24, 2011**

---

The plaintiffs, former employees of the Chattanooga Housing Authority ("CHA"), brought retaliatory discharge actions against the CHA and the Chief of the CHA Public Safety Department, pursuant to the Tennessee Public Protection Act, Tennessee Code Annotated section 50-1-304 (2008 & Supp. 2010), and the Tennessee Human Rights Act ("THRA"), Tennessee Code Annotated section 4-21-301 (2005). The trial court granted the defendants summary judgment on all claims. On appeal, the Court of Appeals vacated summary judgment on the THRA claim, finding genuine issues of material fact, and affirmed the trial court's judgment in all other respects. We affirm the grant of summary judgment on the Tennessee Public Protection Act claims because the undisputed facts establish that the plaintiffs cannot prove the essential element of an exclusive causal relationship between the plaintiffs' whistleblowing activity and their discharge, as required by the statute. We also affirm the Court of Appeals' ruling vacating summary judgment in defendants' favor on the THRA claims because there are genuine issues of disputed fact making summary judgment improper.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed; Case Remanded**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and GARY R. WADE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a concurring opinion.

Michael A. Anderson, Chattanooga, Tennessee, for the appellants, Timmy Sykes and Curtis Greene.

Larry L. Cash, Stacie L. Caraway, and Robert F. Parsley, Chattanooga, Tennessee, for the appellees, Chattanooga Housing Authority and Jeff Hazelwood.

Wade B. Cowan, Douglas B. Janney III, Nashville, Tennessee, William B. Ryan, Memphis, Tennessee, Justin Gilbert, Jackson, Tennessee, and Jennifer B. Morton, Knoxville, Tennessee, for amicus curiae Tennessee Employment Lawyers Association.

## OPINION

### Factual and Procedural Background

Timmy Sykes and Curtis Greene were employed as criminal investigators by the CHA in its police department, also known as the Public Safety Department. Mr. Sykes was hired in July of 2002, shortly after the CHA Public Safety Department was created. Mr. Greene was hired as a criminal investigator in March of 2003.

On or around June 22, 2004, Chief Jeff Hazelwood of the CHA Public Safety Department and Assistant Chief Felix Vess met with Mr. Sykes. At the meeting, Chief Hazelwood presented Mr. Sykes with a "performance counseling and plan for improvement" that documented problems and shortcomings with Mr. Sykes' work as an investigator. The performance improvement plan noted that Mr. Sykes "is frequently late in reporting for duty, meetings, and assignments," that more than once he "completely failed to report as directed or as promised," that he "has failed to thoroughly investigate cases and/or . . . close them in a timely manner," and that he "has worked on days or times outside his normal duty hours without notifying his supervisor." Assistant Chief Vess stated in his affidavit that at the meeting, "I recall Mr. Sykes yelling at Chief Hazelwood, pounding on the table, refusing to remain seated and discuss the Plan without yelling, and actually walking out on Chief Hazelwood at least a couple of times." Mr. Sykes admitted in his deposition that he was "raging mad" and "really upset" at the meeting because he felt that the assessment of his job performance was unfounded and inaccurate.

In an internal memorandum of this meeting, dated June 24, 2004, Mr. Sykes stated that he was called into Chief Hazelwood's office, and that Chief Hazelwood and Assistant Chief Vess "beg[a]n to talk about my lack of performance and work ethics not meeting departmental standards." Mr. Sykes further stated that as they "continued to talk regarding my performance this past month, I somewhat agreed with both of them. My lack of performance was due to personal problems from home, and my mother's condition (Cancer Patient in Texas)." Mr. Sykes continued in the memorandum as follows:

-2-

I feel as though the actions of Chief Hazelwood are that of harassment and intimidation. I have disagreed on several occasions with Chief Hazelwood's style and tactics of policing which I feel have violated citizens['] human rights. There are documented reports that show targeted racial profiling of "Men Per Development" ages 18-35, and a criminal trespass list that has over 1,000 men, ages 18-35 listed on it. . . . Upon submitting this document, I am requesting that this serve as an official grievance notification. I have met and spoke with the Tennessee Human Rights Commission who serve as a local governing authority in agreement with the Federal Equal Employment Opportunity Commission. I obtained a complaint package.

In July of 2004, Mr. Sykes and Mr. Greene met with Anne Henniss, the chairperson of the CHA Board of Commissioners, and told her of their concerns regarding what they considered to be illegal and discriminatory practices, including illegal searches and seizures and racial profiling, by Chief Hazelwood and Assistant Chief Vess. Ms. Henniss contacted Robert Dull, the Deputy Director of Asset Management for the CHA, and, according to his affidavit, "explained to me that Mr. Sykes and Mr. Greene had brought some serious concerns regarding the CHA Public Safety Department to her attention and that she wanted . . . [Chief] Hazelwood to be fired due to these issues." Mr. Dull told Ms. Henniss that there would have to be an investigation and contacted Andrew Lawrence, the CHA Human Resources Director, to ask him to meet with Mr. Sykes and Mr. Greene and investigate their claims.

On July 27, 2004, Mr. Lawrence met separately with Mr. Sykes and Mr. Greene. Both Mr. Greene and Mr. Sykes raised various concerns regarding the operation of the CHA Public Safety Department and Chief Hazelwood. Specifically, Mr. Lawrence stated in his deposition that Mr. Sykes told him that he "had concerns over racial profiling, illegal searches and seizures, and the use of tactical gear" by the CHA police. According to Mr. Sykes' affidavit, his concerns included that Chief Hazelwood "frequently told officers to write up the paperwork for incidents and crimes they did not witness;" that he and Assistant Chief Vess used abusive language with the CHA residents; and that Chief Hazelwood "has used the 'N' word in referring to residents." Mr. Lawrence testified by affidavit that he assured Mr. Sykes and Mr. Greene that the issues they had raised would be investigated, and that they should let him know if they felt that retaliatory action had been taken against them for raising these concerns.

On August 25, 2004, immediately before Mr. Sykes was scheduled to meet with the federal Department of Housing and Urban Development's ["HUD"] Office of Inspector General ["OIG"] on a matter unrelated to his grievances and allegations of impropriety, Mr. Sykes was given written notice that "[e]ffective immediately you are placed on

administrative leave with pay pending the outcome of an internal investigation." Assistant Chief Vess delivered the suspension notice, and he was accompanied by Mr. Lawrence and several CHA Public Safety officers and Chattanooga Police officers. Mr. Sykes testified that Assistant Chief Vess would not tell him the reason for his suspension, and "when I insisted on knowing the reason, Andrew Lawrence said my suspension was due [to] a complaint that I had made a sexual harassment remark toward a female resident." Mr. Sykes filed a charge of discrimination with the Tennessee Human Rights Commission ("THRC") immediately following his suspension.

At an August 19, 2004 residents' council meeting, two CHA residents complained that Mr. Sykes had sexually harassed them and other female CHA residents. According to the CHA, Mr. Sykes was suspended as a result of these complaints. The ensuing investigation of these complaints brought to light other allegations of misconduct by Mr. Sykes in his capacity as a CHA investigator. Assistant Chief Vess testified in his affidavit that after Mr. Sykes was placed on administrative leave, "several arrest warrants which had not been filed with the appropriate court along with some drug paraphernalia which had not been properly secured in CHA's Public Safety evidence room were found in Mr. Sykes' desk." Other allegations surfaced that Mr. Sykes had exceeded his law enforcement authority by going armed and arresting someone in a bar off CHA premises, that he and Mr. Greene had violated CHA policy by operating a "side" security business at the same time he was employed as an investigator, and that Mr. Sykes had engaged in inappropriate conduct with female CHA residents. Following a meeting on August 16, 2004, where Mr. Sykes was presented with these allegations and given an opportunity to address them, the CHA terminated his employment on August 30, 2004.

Turning to the circumstances of Mr. Greene's employment, the CHA asserts that he was terminated because of his repeated violations of the CHA cell phone policy. The CHA personnel policy handbook provided the following regarding employees' cell phone usage:

> CHA provides cell phones for Agency business activities. Every user has the responsibility to use CHA cell phones in a responsible and productive manner. Due to the cost associated with cell phone usage, only incidental personal (non-business related) use is permitted. Misuse or excessive personal use of agency cell phones is subject to management review and may result in reimbursement charges to the employee and/or disciplinary action.

In 2004, Mr. Greene repeatedly had significant overage charges for his cell phone use. These overages are well documented and undisputed. The record includes written memoranda from Chief Hazelwood in 2004 showing the following cell phone overage charges: March – $322.94; June – $360.80; August – $306.75; and September – $298.20. On

October 4, 2004, Chief Hazelwood gave Mr. Greene a written notice that stated the following in pertinent part:

> Effective immediately, you are suspended from duty and law enforcement officer status without pay for a period of three (3) working days. . . .This suspension is a result of your repeated violations of the cell phone usage policy. . . . The violations involve no less than six (6) instances in which you have disobeyed a direct, written order from a supervisor to reimburse CHA for overages on your cell phone bill.

The notice further stated that Mr. Greene owed a total of $1,881.24 for the accumulated cell phone overages, required him to pay this amount by October 8, 2004, and provided that "[f]ailure to pay this amount in-full by the date indicated will result in additional disciplinary action up to and including termination." Mr. Greene responded with a memo stating that he had received the suspension notice and "[t]o resolve this problem I intend to limit my personal calls on CHA cell phones."

By mid-October, Mr. Greene had paid $550 toward the total and was on a payment plan to reimburse the balance. When he returned from his three-day suspension, Mr. Greene was placed on desk duty, assigned to work Wednesday through Saturday from 5 p.m. to 3 a.m., and not allowed to have a cell phone or police vehicle. On October 15, 2004, Mr. Greene wrote a grievance letter to Mr. Lawrence complaining of his treatment following suspension and asserting that he was being retaliated against because he "came to [Mr. Lawrence's] office with factual information about incidents w[h]ere Chief Hazelwood and Assistant Chief Vess have done illegal searches, abused residents, and use improper language when talking to the residents." Mr. Greene alleged that his supervisors "have shown complete prejudice toward me returning to work and also created a hostile work environment for me to be in." Mr. Greene testified in his affidavit that after he was put on desk duty, "Felix Vess asked me if I would be a team player and said I couldn't leave the office until I did what officers needed to do." Shortly thereafter, Mr. Greene was given his cell phone and CHA vehicle back and, according to his deposition, "eventually all my duties were restored with the housing authority."

Mr. Greene filed his complaint and charge of employment discrimination with the THRC in early November of 2004. Beginning in early December of 2004, Mr. Greene took a medical leave of absence pursuant to the Family Medical Leave Act ("FMLA"). During his FMLA leave, Mr. Greene continued to use his CHA cell phone, making over a thousand calls, nearly all of which were personal in nature. After his return to work in early January of 2005, the CHA terminated his employment on January 19, 2005.

Mr. Sykes and Mr. Greene sued the CHA and Chief Hazelwood on April 5, 2005, alleging retaliatory discharge in violation of the Tennessee Public Protection Act, Tennessee Code Annotated section 50-1-304 (commonly known as the "Whistleblower Act"), and the THRA, Tennessee Code Annotated section 4-21-301.[1] Although Mr. Sykes and Mr. Greene filed a joint complaint and have been jointly represented throughout this action, their retaliatory discharge claims are separate and independent. The trial court granted the CHA and Chief Hazelwood's motion for summary judgment on all claims. On appeal, the Court of Appeals vacated summary judgment on the THRA claims, finding genuine issues of material fact, and affirmed the trial court's judgment in all other respects. Sykes v. Chattanooga Hous. Auth., No. E2008-00525-COA-R3-CV, 2009 WL 2365705, at *23 (Tenn. Ct. App. July 31, 2009). We granted both parties' applications for permission to appeal to address whether the trial court erred in granting summary judgment on Mr. Sykes' and Mr. Greene's claims of retaliatory discharge under the Whistleblower Act and the THRA.

**Analysis**

*Summary Judgment Standard*

Summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 5 (Tenn. 2008); Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn. 1993). In Hannan, this Court reaffirmed the basic principles guiding Tennessee courts in determining whether a motion for summary judgment should be granted, stating:

> The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." Byrd, 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. Id. . . .
>
> . . . .

---

[1] Mr Sykes and Mr. Greene also asserted claims of defamation and intentional interference with contract against Chief Hazelwood. The trial court granted Chief Hazelwood summary judgment on these claims, and the correctness of these rulings is not at issue in this appeal because, among other reasons, Mr. Sykes and Mr. Greene have provided no argument nor citation to authority disputing these rulings in their appellate brief.

. . . [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

Hannan, 270 S.W.3d at 5, 8-9.[2]  It is insufficient for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." Id. at 10. "Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient." Martin v. Norfolk S. Ry. Co., 271 S.W.3d 76, 84 (Tenn. 2008).  If the party moving for summary judgment fails to satisfy its initial burden of production, the burden does not shift to the nonmovant and the court must dismiss the motion for summary judgment.  Hannan, 270 S.W.3d at 5; Blanchard v. Kellum, 975 S.W.2d 522, 525 (Tenn. 1998).

The standard by which our courts must assess the evidence presented in support of, and in opposition to, a motion for summary judgment is also well established:

Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997).  A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000).  In making that assessment, this Court must discard all countervailing evidence. Byrd, 847 S.W.2d at 210-11.

Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009).  This Court stated the applicable summary judgment standard in Martin as follows: "the nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." Martin, 271 S.W.3d at 84 (citing McCarley v. W. Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998)).  "The granting or denying of a motion for summary judgment is a matter of law, and our standard of review is de novo with no presumption of correctness." Kinsler v. Berkline, LLC, 320 S.W.3d 796, 799 (Tenn. 2010).

_____

[2] But see 2011 Tenn. Pub. Acts 498 (enacting Tennessee Code Annotated section 20-16-101 with the stated purpose "to overrule the summary judgment standard for parties who do not bear the burden of proof at trial set forth in Hannan v. Alltel Publishing Co., its progeny, and the cases relied on in Hannan") (applicable to actions filed on or after July 1, 2011).

In the recent cases of Kinsler and Gossett v. Tractor Supply Co., 320 S.W.3d 777 (Tenn. 2010), this Court held that the Hannan summary judgment analysis is to be applied in retaliatory discharge actions in the same way as in other cases, and rejected the federal McDonnell Douglas[3] framework of allocation of burdens and order of presentation of proof of each party in favor of the ordinary Tennessee summary judgment standard. Gossett, 320 S.W.3d at 785-86; Kinsler, 320 S.W.3d at 801.[4]

### *Whistleblower Act Claim for Retaliatory Discharge*

The Whistleblower Act, Tennessee Code Annotated section 50-1-304, was enacted as part of the Tennessee Public Protection Act of 1990. 1990 Tenn. Pub. Acts 771. It provides in pertinent part:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> . . . .
>
> (d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304. The provisions of this statute create a narrowly crafted exception to the long-established common law employment-at-will doctrine, which provides generally that "an employment contract for an indefinite term is terminable at the will of either the employer or the employee for any cause or for no cause." Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 535 (Tenn. 2002); see also Mason v. Seaton, 942 S.W.2d 470, 474 (Tenn. 1997) ("Employment-at-will is the fundamental principle controlling the relationship between employers and employees . . . However, even under the common law, an employee is protected from discharge in retaliation for attempting to exercise a statutory or constitutional right, or in violation of a well-defined public policy.").

A Whistleblower Act claimant has the burden of proving the following four elements to prevail on his or her statutory retaliatory discharge claim:

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[4] But see 2011 Tenn. Pub. Acts 461 (amending Tennessee Code Annotated section 50-1-304 and enacting Tennessee Code Annotated section 50-1-701) (effective on and applicable to causes of action accruing on or after June 10, 2011).

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

See Voss v. Shelter Mut. Ins. Co., 958 S.W. 2d 342, 344 (Tenn. Ct. App. 1997). In this case, the only element in dispute is element (4) – whether either Mr. Sykes or Mr. Greene was terminated *solely* for his refusal to participate in or remain silent about the alleged illegal activity, including unlawful searches and seizures and racial profiling of CHA residents and/or visitors.

In Guy, this Court noted that "under the [Whistleblower Act], the plaintiff must demonstrate an exclusive causal relationship between his whistleblowing activity and his subsequent discharge." 79 S.W.3d at 535; see also Collins v. AmSouth Bank, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007) (observing that "the primary difference between the common law and statutory [retaliatory discharge] claims is that, to benefit from statutory protection, an employee must demonstrate that his or her refusal was the *sole* reason for his or her discharge") (emphasis in original); Darnall v. A+ Homecare, Inc., No. 01A01-9807-CV-0034, 1999 WL 346225, at *8 (Tenn. Ct. App. June 2, 1999) (Koch, J., concurring) ("The General Assembly's choice of the term 'solely' means that an employee can prevail with a Tenn. Code Ann. § 50-1-304 claim only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the only reason for the termination.").

To successfully shift the burden of production to the nonmoving party at the summary judgment stage, the CHA must either produce or identify evidence "that affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." See Kinsler, 320 S.W.3d at 800 (quoting Mills v. CSX Transp., Inc., 300 S.W.3d 627, 631 (Tenn. 2009)). The CHA challenges the ability of Mr. Sykes and Mr. Greene to establish the "sole causation" element of their claims. At trial, Mr. Sykes and Mr. Greene must show that the CHA terminated their employment solely for their refusal to participate in or remain silent about the alleged illegal activity. We have carefully reviewed the evidence in the record as outlined above in the light most favorable to the nonmovants, Mr. Sykes and Mr. Greene, and we conclude that the CHA has produced and/or identified evidence that neither Mr. Sykes nor Mr. Greene can establish the essential element of *sole* causation. The *undisputed* evidence in the record establishes valid and legitimate reasons for the CHA to have terminated both Mr. Sykes' and Mr. Greene's employment. Thus, the CHA has successfully shifted the burden to Mr. Sykes and Mr. Greene to demonstrate a genuine issue of material fact regarding whether the

decision to terminate their employment was solely due to their protected whistleblowing activity. Neither Mr. Sykes nor Mr. Greene has produced or identified sufficient evidence to show an issue of material fact on this challenging element of sole causation.

In Mr. Greene's case, he does not dispute that he received the numerous memoranda documenting the CHA's clear cell phone policy, his repeated and egregious violations of the policy and overage charges for excessive personal use of his CHA-issued cell phone, and the clear and unambiguous reprimands and warnings he was given before the CHA finally decided to discharge him. Similarly, Mr. Greene does not dispute that after he received the disciplinary three-day suspension for violating the cell phone policy, and after he failed to fully reimburse his employer for the overage charges, he continued to use the cell phone for more than one thousand personal calls while on medical leave.

Regarding Mr. Sykes, he does not dispute receiving the performance improvement plan in June of 2004 asserting that he was "frequently late in reporting for duty, meetings, and assignments," "completely failed to report as directed or as promised," "failed to thoroughly investigate cases," and has "worked on days or times outside his normal duty hours without notifying his supervisor," *before* he filed his first grievance alleging any impropriety by CHA and Chief Hazelwood. Mr. Sykes did not dispute the testimony of Chief Hazelwood and Assistant Chief Vess that at the meeting where they discussed the performance improvement plan, in the words of Chief Hazelwood's affidavit, Mr. Sykes "became belligerent, began yelling at me, standing up out of his chair, banging on the table . . . and stormed out of the meeting at least a couple of times." Mr. Sykes' own testimony confirmed that he was "raging mad," stormed out of the meeting, and had to be calmed down and brought back by Assistant Chief Vess. In an answer to an interrogatory, Mr. Sykes admitted that "Curtis Greene and I opened a security consulting business called S&G Security Consultants in January of 2004 and operated for about eight to ten months." A copy of their business card that lists the CHA's fax number as the fax number for their security consulting business is in the record. It is undisputed that CHA did not allow its investigators to be employed by other entities as security or public safety officers. Further, the record contains official written documentation of arrest warrants that had been issued by Mr. Sykes but not filed with the appropriate court, and drug paraphernalia evidence that had been improperly secured in Mr. Sykes' desk.

By requiring a plaintiff employee to show that he or she was "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities," the legislature has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the Whistleblower Act. In summary, even viewing all the proof in the light most favorable to Mr. Sykes and Mr. Greene, a reasonable juror could not conclude that the sole reason for the termination of Mr. Sykes' and

-10-

Mr. Greene's employment was their refusal to participate in or remain silent about the alleged illegal activities in this case. The trial court's summary judgment in favor of the CHA and Chief Hazelwood pursuant to Tenn. Code Ann. § 50-1-304 is affirmed.

### *Tennessee Human Rights Act Claim for Retaliatory Discharge*

Mr. Sykes and Mr. Greene also each brought an action under the THRA, Tennessee Code Annotated section 4-21-301, which provides that it is a discriminatory practice to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter." In Allen v. McPhee, 240 S.W.3d 803, 820 (Tenn. 2007) (abrogated on other grounds by Gossett, 320 S.W.3d at 783-84), we held that a claimant must prove the following four elements to prevail on a retaliation claim under the THRA:

(1) that [the plaintiff] engaged in activity protected by the THRA;
(2) that the exercise of [the plaintiff's] protected rights was known to the defendant;
(3) that the defendant thereafter took a materially adverse action against [the plaintiff]; and
(4) there was a causal connection between the protected activity and the materially adverse action.

Id. In this case, the only contested element is, again, causation; the CHA and Chief Hazelwood each assert that they have either affirmatively negated the essential element of the causal connection between the protected activity and Mr. Sykes' and Mr. Greene's termination, or have shown that neither Mr. Sykes nor Mr. Greene can prove causation at trial. Importantly, a THRA claim does not require a showing of sole causation as does a Whistleblower Act claim. Therefore, Mr. Sykes and Mr. Greene may survive summary judgment by demonstrating that, assessing the evidence in the light most favorable to their position and discarding all countervailing evidence, there exists a genuine issue of material fact regarding whether there was a causal connection between their complaints of discriminatory and illegal practices by the CHA and Chief Hazelwood and their termination. Both Mr. Sykes and Mr. Greene have met their burden and therefore summary judgment was incorrectly granted on their THRA claims.[5]

---

[5] But see 2011 Tenn. Pub. Acts 461 (amending Tennessee Code Annotated section 4-21-311) (effective on and applicable to causes of action accruing on or after June 10, 2011).

In making a determination of whether a causal link exists between a protected activity such as a complaint filed with the THRC and a materially adverse action taken by an employer, "courts consider whether an employer's conduct can be linked to retaliatory intent." Allen, 240 S.W.3d at 822. As we observed in Guy, where "the essential factor to be determined is the employer's motivation, direct evidence of that motivation is rarely within the plaintiff's possession." 79 S.W.3d at 534. Consequently, circumstantial evidence of an employer's retaliatory motive is relevant, probative, and frequently important to a plaintiff's case regarding causation. See id.; Allen, 240 S.W.3d at 822-23. In making this determination, courts inquire "whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational trier of fact to infer a [retaliatory] motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" Guy, 79 S.W.3d at 534 (quoting Mason, 942 S.W.2d at 474).

Circumstantial evidence that is pertinent and probative on the issue of causation and retaliatory intent includes, but is not limited to, (1) temporal proximity of the adverse action to the complaint, see Allen, 240 S.W.3d at 822; (2) a pattern of workplace antagonism following a complaint, id.; (3) an employer's failure to adhere to established company policy in dealing with the employee, see Newcomb v. Kohler Co., 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006); (4) "discriminatory treatment when compared to similarly situated employees," id.; (5) evidence of a good work history and high or solid performance evaluations of the employee, cf. Guy, 79 S.W.3d at 538-39; (6) "sudden and marked changes in an employee's performance evaluations" after the exercise of the employee's protected rights, Newcomb, 222 S.W.3d at 391; and (7) "evidence tending to show that the [employer's] stated reason for discharge was false." Id.

In the present case, although the CHA has pointed to substantial evidence of legitimate, non-discriminatory reasons for terminating Mr. Sykes' and Mr. Greene's employment, both Mr. Sykes and Mr. Greene hotly dispute many of these proffered reasons. In Mr. Greene's case, there is evidence that numerous other CHA employees were also in violation of the cell phone policy and had overage charges, but that they were not disciplined as was Mr. Greene. Mr. Sykes testified in his affidavit that it was his understanding that "public safety officers could use their cell phones for personal use as long as they paid the overages. In 2002 and 2003, I always had the largest cell phone bill, and I paid the charges every month. There was no issue made about this practice." Mr. Sykes alleged that he was not disciplined for his cell phone usage, and "[i]n fact, there was no issue made as to any employee to my knowledge until after Curtis Greene filed his grievance, and then only Mr. Greene faced discipline."

Mr. Greene also points to the unusual and, he argues, retaliatory treatment he received following his three-day suspension when he was placed on desk duty not during regular

office hours, but from 5 p.m. to 3 a.m. on Wednesday through Saturday. When Mr. Greene complained about this treatment, the CHA Human Resources Department ordered that his desk duty hours should conform to normal office hours immediately. Mr. Greene also argues that the involvement of Assistant Chief Vess in the investigations and disciplinary actions of this case violated the usual operating procedures of the CHA, in that Assistant Chief Vess was one of the individuals whom he and Mr. Sykes had alleged were involved in the unlawful practices complained of in their THRC claims. Finally, Mr. Greene points to his solid work history and the evidence in the record that he was never given a negative employment review.

Mr. Sykes similarly points to the evidence that the only employment review he received from the CHA was generally positive. Mr. Sykes argues that the charges of sexual harassment and misconduct were trumped-up and pretextual, pointing to the lack of evidence substantiating these claims provided by the CHA. Although the record contains an unsigned one-page document purporting to summarize the interview that Mr. Dull conducted with the two alleged resident complainants, there is no affidavit or otherwise admissible evidence from the complainants. Mr. Sykes also points to the involvement of Assistant Chief Vess in his disciplinary actions, and alleges that the CHA did not follow its standard employment practices when it called him on his cell phone an hour before his scheduled meeting with HUD's OIG, told him not to report to that meeting, and shortly thereafter showed up with several officers of the Chattanooga Police and CHA Public Safety and Human Resources to give him his suspension notice.

Finally, there is a close temporal proximity between the complaints of both Mr. Sykes and Mr. Greene and their employment terminations. CHA makes two arguments regarding the "temporal proximity" factor. First, CHA argues that all of Mr. Sykes' and Mr. Greene's alleged indicators of retaliation occurred *before* the CHA received notice of the filing of their THRC charges. In Mr. Sykes' case, CHA argues that he had already been suspended and most of the investigation regarding the allegations of sexual harassment had been completed before it received notice of his THRC claim of discrimination. In Mr. Greene's case, CHA argues that he had already been suspended when he filed his THRC charge. However, a trier of fact could reasonably conclude from the evidence in the record that the CHA and Chief Hazelwood were aware that Mr. Sykes and Mr. Greene had already filed grievances, made claims of discrimination, illegal searches and seizures, and racial profiling against African-American males, and were in the process of preparing claims with the THRC, when they were disciplined by the CHA. Mr. Dull and Mr. Lawrence were well aware that Mr. Sykes and Mr. Greene had spoken with Commissioner Henniss about their concerns and grievances. Further, the memo prepared by Mr. Sykes following his meeting on June 22, 2004 with Chief Hazelwood and Assistant Chief Vess documented his statements that "I am requesting that this serve as an official grievance notification. *I have met and spoke with the*

*Tennessee Human Rights Commission* who serve as a local governing authority in agreement with the Federal Equal Employment Opportunity Commission. I obtained a complaint package." (Emphasis added).

Second, the CHA argues that the combined effect of our opinions in Allen and Gossett creates a "perfect storm" for employers that, according to its brief, "**guarantees** a jury trial to any employee who makes a complaint under the THRA and then is terminated closely thereafter, regardless of the reason for the termination." (Emphasis in original). We disagree. In Gossett, we held that trial courts presented with a summary judgment motion in a common law retaliatory discharge case should not apply the federal McDonnell Douglas framework of allocation of burdens and order of presentation of proof of each party "because it is incompatible with Tennessee summary judgment jurisprudence." Gossett, 320 S.W.3d at 779. We noted that this holding "allows courts to conduct the same summary judgment analysis in all cases." Id. at 785.

In Allen, we held that "close temporal proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation." 240 S.W.3d at 823. Allen simply recognized that, pursuant to the McDonnell Douglas framework, demonstrating close temporal proximity established a prima facie case that triggered the employer's burden to submit proof of the reason employer sanctioned the employee. Gossett did not change Allen's holding to mean that any plaintiff who can demonstrate close temporal proximity is automatically entitled to a trial on his or her retaliatory discharge claim.

Instead, close temporal proximity between a protected activity and an adverse employment action is a fact that an employee may offer to demonstrate that a genuine issue of material fact exists as to the causation element. As with other facts proffered by the employee in opposition to a summary judgment motion, the court should consider temporal proximity in a light most favorable to the nonmoving party. Contrary to CHA's assertion, a court's consideration of temporal proximity "does not exclude the possibility of summary judgment when an employer presents *undisputed* evidence that a legitimate reason was the *exclusive* motivation for discharging the employee." Gossett, 320 S.W.3d at 786 (emphasis in original).

In the present case, the closeness in time between Mr. Sykes' and Mr. Greene's grievances and complaints and the CHA's disciplinary actions, including their termination, is one of many facts proffered by Mr. Sykes and Mr. Greene in opposition to CHA's motion for summary judgment. Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving parties and disregarding countervailing proof, we hold that both Mr. Sykes and Mr. Greene have identified genuine issues of material fact as to whether there was a causal connection between their protected activity and the materially

-14-

adverse action taken against them.  Because these genuine issues of material fact are "easily ascertainable and dispositive of summary judgment, conducting the burden-shifting analysis described in <u>Hannan</u> . . . is unnecessary to the disposition" of this claim.  <u>Kinsler</u>, 320 S.W.3d at 801.  Summary judgment on the THRA claims was therefore inappropriate.

## Conclusion

We concur with the Court of Appeals' conclusion that although a trier of fact could not reasonably conclude that Mr. Sykes and Mr. Greene were discharged *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities, a reasonable jury could conclude that there was *a* causal connection between their employees' protected activity and the employer's materially adverse action.  The judgment of the Court of Appeals is affirmed and the case remanded to the Circuit Court for Hamilton County.  Costs on appeal are assessed one-half to the appellants, Timmy Sykes and Curtis Greene, and one-half to the appellee, Chattanooga Housing Authority.

_____
SHARON G. LEE, JUSTICE