IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Submitted on Briefs June 13, 2011

**SHARON HARTMAN v. TENNESSEE BOARD OF REGENTS d/b/a
TENNESSEE TECH UNIVERSITY**

**Appeal from the Chancery Court for Putnam County**
**No. 2009-57      Ronald Thurman, Chancellor**

_____

**No. M2010-02084-COA-R3-CV - Filed August 31, 2011**

_____

In this employment dispute, a former employee claims she was unlawfully discriminated against on the basis of her gender. The plaintiff, a long time employee, was terminated after failing to adhere to her employer's policies and procedures concerning the purchase of inventory and equipment. Claiming this reason was pretextual, she filed this action pursuant to the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq*. After discovery, the employer moved for summary judgment. The trial court granted the motion, finding the employer demonstrated that the plaintiff could not establish that a similarly situated male employee was treated more favorably. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

James L. Harris, Nashville, Tennessee, for the appellant, Sharon Hartman.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General; and Michael Markham, Assistant Attorney General, for the appellee, Tennessee Board of Regents, d/b/a Tennessee Tech University.

**OPINION**

The plaintiff, Sharon Hartman, was employed at Tennessee Tech University ("the University") in the Facilities Department for approximately thirteen years. She began working as a level I Stock Clerk, and was promoted to a level III Stock Clerk after one year. As a level III Stock Clerk, Ms. Hartman was responsible for maintaining the inventory of a central campus warehouse, which served as a storage facility for equipment and supplies

used by the various Facilities sub-departments. These sub-departments were referred to as "shops," and were divided into Custodial/Grounds shops and Maintenance shops.

In order to manage the warehouse inventory, Ms. Hartman made frequent purchases of supplies and equipment; as such, she was required to be intimately familiar with the University policies and procedures concerning these tasks. The Facilities Department had outstanding contracts with several supply and equipment vendors, and when purchasing supplies from those vendors, Ms. Hartman simply determined the number of supplies needed based on the current supply and placed the order, regardless of the size or price of the order.

For supply and equipment purchases from other vendors, the University policy mandated different procedures depending on the dollar amount involved. Because the University is a public institution receiving state funding, these policies are essential to ensure compliance with state law on public purchases.[1] For purchases under a certain specified amount, Ms. Hartman was required to price the needed items with several vendors and place the order with the vendor offering the lowest price. These purchases were typically done over the phone. Larger purchases required Ms. Hartman to work more closely with the University Purchasing Office in a formal bidding process. Ms. Hartman was required to solicit bids from at least three potential vendors and then submit documentation to the Purchasing Office relaying the terms of each bid, including the price, time for delivery, and any other relevant information. In most cases, the vendor with the lowest bid would be awarded the contract or order. Occasionally, the Purchasing Office would authorize Ms. Hartman to accept a higher bid if, for example, the lowest bid would not be deliverable within the time needed. University policy prohibited Ms. Hartman from accepting a higher bid without authorization from the Purchasing Office. When the winning bid was chosen, the Purchasing Office would generate a numbered purchase order for Ms. Hartman, who would then place the order.

The University is always billed by invoice. When the Accounts Payable Department receives an invoice, it matches the invoice to a purchase order to ensure the purchase was authorized. In the event there is no purchase order, the Purchasing Office must generate a "confirmation" document to indicate approval of the purchase so that the invoice can be paid. Confirmations are typically used in place of purchase orders when an emergency arises and supplies are needed immediately.

When Ms. Hartman first began working at the University, she was required to "bid out" purchases of $250 or more. By the time she was terminated, the amount had increased to $5,000. By that time, Ms. Hartman rarely had to consult with the Purchasing Office, as most purchases were less than $5,000 or were with a supplier under contract.

---

[1]These statutes can be found at Tenn. Code Ann. § 12-3-101 *et seq.*

One year before Ms. Hartman was terminated, the University began using a new computerized system, called "Banner," which required her to record every purchase, regardless of whether it had to be reviewed by the Purchasing Office. The new system also generated a number for each purchase, however it was not intended to replace the need for purchase orders.

The University had a long-running contract with Total Filtration Systems ("TFS") for the supply of air conditioning filters. The filters were custom made, and ordered on an as-needed basis. Ms. Hartman began to experience long delivery delays with TFS around Fall 2008. Ms. Hartman met with Troy Harris, the HVAC shop supervisor, Andy Loftis, who was Mr. Harris's supervisor, and Judy Hull, the head of the Purchasing Office and Ms. Hartman's supervisor at that time. They agreed that, due to the delivery problems with TFS, Ms. Hartman should begin to pursue a contract with another supplier, and once that was accomplished, she would begin placing a regular quarterly order. In addition, because the University's contract with TFS did not require that TFS be the exclusive filter supplier, Ms. Hartman solicited bids for an order until a new supplier for the filters could be placed under contract. This was intended to get the University caught up on its replacement filter needs. Such an order was anticipated to be significantly larger than a typical order; well over her $5,000 authority.

Ms. Hartman contacted TFS, and two other filter manufacturers, C.C. Dickson, Co. ("Dickson"), and American Air. TFS quoted the same price as under the contract, but also informed Ms. Hartman it would not be able to meet the two-week deadline. American Air declined to offer a price, stating it would take at least six to eight weeks to fill an order of that size. Dickson submitted a higher price than TFS, but assured Ms. Hartman it could deliver the filters within two weeks. Based on its assurance of timely delivery, Ms. Hartman placed the order. Although she exchanged several emails with Judy Hull, she did not submit bidding documents to the Purchasing Office, and she did not receive a purchase order. She did record the purchase in the Banner computer system.

The Dickson filters were delivered in two shipments, with a different invoice accompanying each shipment. The first invoice was for $5,570.15, and the second for $3,388.68, for a total of $8,958.83, which was approximately $3,000 more than the TFS contract price.

Ms. Hartman attempted to return a portion of Dickson's first shipment; however, Dickson refused to accept any returns because the filters were custom made. When the University Accounts Payable Department received the first invoice and discovered there was no purchase order, they referred the matter to Ms. Hull in the Purchasing Office. Ms. Hull tracked the order to Ms. Hartman, and asked her to prepare a memo explaining why she did

not follow the customary procedure. At that point, Ms. Hull was not aware of the second invoice.

Ms. Hartman explained that she had not been required to get a Purchase Order from the Purchasing Office in several years, and she thought she was following the correct procedure by contacting the three sellers and entering the transaction into the Banner computer program. She also stated that, because she had consulted with Ms. Hull about terminating the TFS contract, she thought the Purchasing Office was also on board. She admitted to making "several mistakes," but also explained that she was following the recommendations of the HVAC shop and responding to what they had classified as an emergency filter shortage. In the meantime, Ms. Hull received the second invoice. After reviewing the second invoice and Ms. Hartman's memo, Ms. Hull refused to issue a confirmation for payment of the invoices. She forwarded the invoices and the memo to Dr. Michael Nivens, the Director of Facilities and Business Services. Ms. Hull explained that, "[d]ue to the blatant nature of these violations of state law and purchasing policies and procedures by a long-term employee whose primary job duties include adherence to the same, I cannot issue a confirmation for payment of these invoices from state funds and must refer this matter to senior administration." She listed five separate infractions by Ms. Hartman.

Ms. Hartman was subsequently required to attend two meetings concerning the Dickson filter order with Dr. Nivens, Ms. Hull, and Jimmy Crabtree, the Director for the warehouse, who had recently replaced Ms. Hull as Ms. Hartman's supervisor. After the second meeting, Dr. Nivens sent a memo to Dr. Claire Stinson, the Vice President for Business and Fiscal Affairs at the University, recommending that Dr. Stinson confirm payment of the Dickson invoices because the order had been filled in good faith and the custom filters could not be returned. Regarding Ms. Hartman, Dr. Nivens concluded that "proper procurement efforts were not exercised by an employee with a long standing knowledge of proper procedure." He stated that her actions amounted to "blatant purchasing violations" and "a violation of the public faith," and resulted in "unnecessary extra costs to the University." Dr. Nivens recommended for cause termination of Ms. Hartman's employment.

Dr. Stinson accepted Dr. Nivens' recommendation, which was also approved by Michael Cowan, the Director of Human Resources at the University, and Ms. Hartman was terminated January 21, 2009.

## Procedural History

On February 29, 2009, Ms. Hartman filed suit against the Tennessee Board of Regents, d/b/a Tennessee Tech University ("the Board of Regents"), asserting that she had

been terminated as a result of her gender, in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* She alleged that the stated reason for her firing – the violation of the University purchasing policies – was pretextual, as evidenced by the fact that a similarly situated male employee, Troy Gregory Parks, the supervisor of the plumbing shop, had violated the same purchasing policy and had not been terminated or reprimanded. Specifically, she alleged:

7.      On January 21, 2009, Plaintiff was terminated for allegedly going over the required monetary limit for purchase of supplies. Plaintiff would show that a male employee, similarly situated in all relevant respects to the Plaintiff, had also exceeded the monetary limit for purchasing supplies but was not terminated.

8.      Plaintiff would show that the reason for her termination was pretextual and that she was discriminated against in the terms and conditions of her employment because of her gender. That the male employee in question received preferential treatment in that he was not terminated.

In its answer, the Board of Regents denied Ms. Hartman's allegations and reaffirmed its position that she had been terminated for "going over the required monetary limit for the purchase of supplies" and for failing to "follow the appropriate procedure in making the purchases."

The parties proceeded to engage in discovery. Concerning Troy Parks, they learned that as the plumbing shop supervisor, he was required to identify plumbing issues on campus, determine the type and amount of materials and equipment needed to address the issue, and organize the plumbing shop employees and assign them to particular jobs, among other responsibilities. When he needed to purchase supplies and equipment, he worked with either Ms. Hartman or a buyer from the Purchasing Office.

In October 2008, Mr. Parks contacted a potential vendor, Williams Wholesale Supply Group ("Williams Wholesale"), to purchase supplies to perform a repair on a university swimming pool. He did not solicit bids from any other suppliers, and asked that the supplies be delivered to the job site. However, according to Mr. Parks, when Williams Wholesale priced the items at over $5,000, he rejected the order and informed Williams Wholesale he was not authorized to make an order for over $5,000 without undergoing the bidding process. Williams Wholesale accepted a return of the goods and withdrew its initial invoice. Mr. Parks then solicited bids from three potential suppliers, including Williams Wholesale. Williams Wholesale reduced its pricing for the supplies to less than $5,000, which was ultimately the lowest bid, and was awarded the contract. The Purchasing Office generated

a purchase order, which was paid when Accounts Payable received the second, adjusted invoice.

After learning Ms. Hartman had been terminated for violating the purchasing policies, Mr. Parks spoke to his supervisors about the incident. Dr. Nivens, the Director of Facilities and Business Services who had recommended Ms. Hartman be terminated, decided not to punish Mr. Parks, because the first invoice was withdrawn and the supplies were properly bid out before the University was required to make any payments.

Following discovery, the Board of Regents moved for summary judgment, arguing that it had affirmatively negated an essential element of Plaintiff's claim by showing there were no similarly situated males who were treated any differently than she had been treated; and furthermore, that the undisputed facts showed the Board of Regents had a legitimate, non-discriminatory reason for terminating Plaintiff, that is, her failure to follow the purchasing policies.

Troy Parks, the Board of Regents argued, was not a similarly situated employee, because he was a plumbing supervisor whose duties rarely involved making purchases, and he was not expected to have the same purchasing expertise as Plaintiff, for whom making purchases was an essential function of her job. Moreover, the Board of Regents argued, Mr. Parks did not actually violate the purchasing policy, because the purchase of the pool repair supplies was not completed until after the supplies were bid out. Plaintiff, on the other hand, committed blatant violations of the purchasing policy by not properly bidding out the air conditioning filters, not providing adequate documentation of the prices bid by TFS and American Air, accepting a bid other than the lowest without permission, and by acting without a purchase order, costing the University thousands of dollars.

For her part, Ms. Hartman argued that because both she and Mr. Parks were subject to the same purchasing policies and procedures at the University, they were similarly situated. She also argued there was a genuine issue of material fact as to whether the Board of Regents's stated reason for Ms. Hartman's termination was pretextual.

Following a hearing on September 10, 2010, the trial court concluded that the Board of Regents affirmatively negated an essential element of Ms. Hartman's claim by showing no similarly situated male employee was treated differently. The trial court entered an order granting the Board of Regents's motion and dismissing the complaint. Ms. Hartman filed a timely appeal.

ANALYSIS

SUMMARY JUDGMENT

This case is on appeal from a grant of summary judgment. Summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). It is appropriate in virtually all civil cases that can be resolved on the basis of legal issues alone. *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001).

The "basic principles guiding Tennessee courts in determining whether a motion for summary judgment should be granted," as articulated in *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008), were recently confirmed by our Supreme Court in *Skyes v. Chattanooga Housing Authority*, __ S.W.3d __, 2011 WL 2517145, at *4-5 (Tenn. June 24, 2011).[2] Quoting *Hannan*, the *Sykes* court stated:

> The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Byrd*, 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Id. . . .*
> . . . .
> . . . [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

*Sykes*, 2011 WL 2517145, at *5 (quoting *Hannan*, 270 S.W.3d at 5, 8-9).

It is further well-established that, whichever approach the moving party takes, both require more than assertions of the nonmoving party's lack of evidence. *Martin*, 271 S.W.3d

---

[2]As the Court notes in *Sykes*, our legislature recently passed 2011 Tenn. Pub. Acts 498, "enacting Tennessee Code Annotated section 20-16-101 with the stated purpose 'to overrule the summary judgment standard for parties who do not bear the burden of proof at trial set forth in *Hannan v. Alltel Publ'g Co.*, its progeny, and the cases relied on in *Hannan*.'" 2011 WL 2517145, at *5 n.2. However, as the *Sykes* court also points out, the new legislation will only impact causes of action accruing after June 10, 2011. *Id.*

at 83-84. In addition, the moving party must present evidence that more than "raises doubts" about the ability of the nonmoving party to prove its claim at trial. *Id.* at 84. The moving party must produce evidence or refer to previously submitted evidence. *Id.*; *accord Hannan*, 270 S.W.3d at 5. Thus, to negate an essential element of a claim, a moving party must refer to evidence that tends to disprove an essential element of the claim made by the nonmoving party. *Martin*, 271 S.W.3d at 84.

If the moving party makes a properly supported motion, then the nonmoving party is required to establish the existence of the essential elements of the claim. *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215. If, however, the moving party does not properly support the motion, then the nonmoving party's burden to produce either supporting affidavits or discovery is relieved and the motion must fail. *McCarley*, 960 S.W.2d at 588; *Martin,* 271 S.W.3d at 83. Thus, the Board of Regents, as the moving party, had the burden to *negate* an essential element of Plaintiff's gender discrimination claim, *or* establish that Plaintiff cannot prove an essential element of her claim at trial. *See Martin*, 271 S.W.3d at 83 (citing *Hannan*, 270 S.W.3d at 5; *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n.5).

Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness. *Martin v. Norfolk Southern Ry. Co.,* 271 S.W.3d 76, 84 (Tenn. 2008). The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1977). Moreover, as does the trial court, the appellate court must consider the evidence in the light most favorable to the nonmoving party and resolve all inferences in that party's favor. *Martin,* 271 S.W.3d at 84; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

### THE TENNESSEE HUMAN RIGHTS ACT

Ms. Hartman asserts that she was unfairly discharged from her position as a Stock Clerk because of her gender, an act specifically defined as "a discriminatory practice" by Tenn. Code Ann. § 4-21-401(a)(1) of the Tennessee Human Rights Act ("THRA").

The THRA prohibits discrimination on the basis of "race, creed, color, religion, sex, or national origin in connection with employment . . . ." Tenn. Code Ann. § 4-21-101(a)(3). One of the THRA's stated purposes is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Act of 1964, 1968 and 1972, the Pregnancy Amendment of 1978, and the Age Discrimination in Employment Act of 1967, as amended." Tenn. Code Ann. § 4-21-101(a)(1). Thus, "we may look to federal law for guidance in enforcing our own anti-discrimination laws." *Barnes v. Goodyear Tire & Rubber Co.* 48

S.W.2d 698, 705 (Tenn. 2000); *see also Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003) ("The general analytical framework . . . applies to claims of employment discrimination based on either federal or state law."). Furthermore, we apply the same principles to analyze an employment discrimination claim, "whether the alleged discrimination is based on age, sex, race or any other category covered by the Tennessee Human Rights Act." *Dennis*, 119 S.W.3d at 693.

As noted above, discharging an employee based on the employee's sex is a "discriminatory practice," prohibited by the THRA. *See* Tenn. Code Ann. § 4-21-401(a)(1). Without direct proof of discrimination on the part of the employer, as is often the case, a plaintiff can establish a prima facie case of gender discrimination, by showing that he or she: 1) is a member of a protected class, 2) suffered an adverse employment action, 3) was qualified for the position at issue, and 4) was replaced by a person outside of the protected class *or* was treated less favorably than similarly situated employees who are not members of the protected class and who engaged in similar conduct. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

Because this case was resolved on a motion for summary judgment, we must determine whether the Board of Regents successfully shifted the burden of production to Ms. Hartman by affirmatively negating an essential element of her claim, or by showing she cannot prove an essential element of her claim at trial.[3] *Hannan*, 270 S.W.3d at 5, 8-9.

The first three elements of a sex discrimination claim are not at issue in this case. As for the fourth element, Ms. Hartman does not allege she was "replaced by a person outside of the protected class"; therefore, the disputed element is whether Ms. Hartman was treated less favorably than similarly situated employees who are not members of the protected class. *Id.* Thus, to be entitled to summary judgment, the Board of Regents must produce or refer to evidence that affirmatively disproves Ms. Hartman's allegation that Troy Parks is a similarly situated male employee who engaged in similar conduct and that Mr. Parks was treated more favorably than Ms. Hartman. *Martin*, 271 S.W.3d at 84.

---

[3]The Tennessee Supreme Court has rejected the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), at the summary judgment stage in employment retaliation claims in Tennessee. *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 785 (2010) (holding that "the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee Summary Judgment jurisprudence"); *see also Sykes v. Chattanooga Housing Authority*, 2011 WL 2517145, at *5 (stating that "this Court . . . rejected the federal *McDonnell Douglas* framework of allocation of burdens and order of presentation of proof of each party in favor of the ordinary Tennessee summary judgment standard") (citations omitted).

Our analysis is specifically focused on Troy Parks. This is because in her complaint, Ms. Hartman makes it clear that her claim is based on the fact that she was treated less favorably than "a male employee" and "the male employee in question," not several male employees or male employees generally. As noted earlier, she alleged in pertinent part:

7.      On January 21, 2009, Plaintiff was terminated for allegedly going over the required monetary limit for purchase of supplies. Plaintiff would show that *a male employee*, similarly situated in all relevant respects to the Plaintiff, had also exceeded the monetary limit for purchasing supplies but was not terminated.

8.      Plaintiff would show that the reason for her termination was pretextual and that she was discriminated against in the terms and conditions of her employment because of her gender. That *the male employee in question* received preferential treatment in that he was not terminated.

(Emphasis added). Ms. Hartman has not since alleged the preferential treatment of any similarly situated male employees other than Mr. Parks, nor is there any evidence in the record which would support such an allegation. Furthermore, there is no issue concerning the relative treatment of Troy Parks and Ms. Hartman: Ms. Hartman was terminated while Troy Parks remains employed. Thus, the narrow focus of our inquiry is whether Ms. Hartman and Mr. Parks are "similarly situated employees."

To be considered similarly situated in an employment disciplinary context, "the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citations omitted) (emphasis added); *see also Perry v. McGinnis*, 209 F.3d 597, 602 (6th Cir. 2000).

Having reviewed the evidence in the light most favorable to Ms. Hartman and resolving all inferences in her favor as the non-moving party, we have determined the Board of Regents has put forth undisputed evidence that affirmatively negates an essential element of Ms. Hartman's claim. Specifically, the Board of Regents has shown that Troy Parks is not similarly situated to Ms. Hartman because they have substantially different job titles and responsibilities. *See Campbell v. Hamilton County*, 23 F. App'x 318, 326 (6th Cir. 2001) (finding that employees with different job titles were not similarly situated); *see also Mitchell v. Detroit Med. Ctr.*, No. 99–1402, 2000 WL 977349, at *2 (6th Cir. July 3, 2000) (concluding that employees with different job duties were not similarly situated).

The duties and responsibilities listed on Ms. Hartman's official job description include: "Maintains warehouse stock item inventory. Solicits, evaluates and awards bids; and orders warehouse stock items," "Initiates bid process for warehouse stock items," "Makes contract award recommendations to Purchasing [Office] regarding warehouse inventory stock items," "Secures additional specification recommendations to Purchasing regarding warehouse inventory stock items."

Troy Parks's official job description, by contrast, does not contain a single reference to the purchasing guidelines or the bidding process. According to Ms. Hartman, Mr. Parks was required to work with a Buyer from the Purchasing Office, or someone with equivalent purchasing authority in order to make purchases. The affidavit of Dr. Michael Nivens, the director of Facilities and Business Services, states that "Troy Parks does not have the same kind of purchasing authority as [Ms. Hartman.] [Ms. Hartman] was a purchaser. Mr. Parks is not, and he is not expected to have the same level of knowledge regarding the purchasing policies." The affidavit of Dr. Claire Stinson, the Vice-President for Finance and Planning, states, "[Troy Parks] is not expected to be familiar with the purchasing guidelines. It was a job requirement that [Ms. Hartman] be familiar with the purchasing guidelines."

Ms. Hartman does not dispute these facts. Instead she contends the court should not consider the differing levels of responsibility and authority when evaluating whether she is similarly situated to Troy Parks. In essence, she asserts that the only relevant similarity in this case is the fact that both she and Mr. Parks were subject to the same purchasing rules and that they both violated those rules. We find no merit in this argument. It was a job requirement for Ms. Hartman to know and understand the purchasing policies because she had significant discretion in carrying out purchases using public funds. Mr. Parks on the other hand, required supervision when carrying out purchases, often times supervision by Ms. Hartman. He did not fail to fulfill an essential job requirement when he violated the purchasing policy.

Nor is there any reasonable inference that the University acted in a discriminatory manner by classifying knowledge and understanding of the purchasing policies as a "job requirement" for Ms. Hartman, but not for Mr. Parks. Purchasing decisions by Ms. Hartman had the potential to have a great impact on the University. Violations of employer policy by employees entrusted with a high level of authority and responsibility carry a greater risk for the employer. This is especially true when the violation is in the employee's stated area of expertise.

Moreover, Ms. Hartman's conduct was different from Mr. Parks's. Troy Parks voluntarily informed his supervisors about his order before the University was required to pay the supplier. By contrast, Ms. Hartman's supervisors approached her after the first invoice arrived on the filters, which were custom made and non-refundable. Even at that

time, she did not inform her supervisors that the order was not complete, and that a second invoice would be arriving. Ms. Hartman argues that the effects of her actions vis á vis those of Mr. Parks are irrelevant, because the fact remains that they both violated the same rule. Again, we disagree. It is significant that Mr. Parks voluntarily notified his supervisors at a time when the damage could be limited.

We have, therefore, concluded that the Board of Regents affirmatively negated an essential element of Ms. Hartman's claim by presenting undisputed evidence that there was not a male employee similarly situated to Ms. Hartman who received more favorable treatment by the Board of Regents or any University supervisors. *See Clayton*, 281 F.3d at 610; *Ercegovich*, 154 F.3d at 352. Specifically, the Board presented evidence of significant differences between Ms. Hartman and Mr. Parks concerning relevant aspects of their respective jobs: Knowing and understanding the purchasing policies and procedures was an essential requirement of Ms. Hartman's job, whereas Mr. Parks was not expected to know the procedures and worked with the Purchasing Office when he needed to purchase equipment or inventory; Ms. Hartman had more authority to carry out larger purchases of a wider variety of products, because she made equipment and supply purchases for all of the Facilities Department Shops, while Mr. Parks only worked with the Plumbing Shop; last, Mr. Parks voluntarily informed his supervisors about his violation, while Ms. Hartman's supervisors only learned the full extent of her purchase after the second invoice arrived.[4] Although this is not necessarily an exhaustive comparison of Ms. Hartman's employment situation to Mr. Parks's, we find that given these significant differences, it would be impossible for Ms. Hartman to establish that Troy Parks is similarly situated in "all of the relevant aspects." *See Ercegovich*, 154 F.3d at 352.

By presenting this undisputed evidence, the Board of Regents demonstrated Ms. Hartman would be unable to establish an essential element of her claim, thus shifting the burden of production to Ms. Hartman "to show that a genuine issue of material fact exists." *Hannan*, 270 S.W.3d at 5. Ms. Hartman has failed to do so.

For the foregoing reasons, we find the Board of Regents demonstrated there is no genuine issue of material fact in this matter, and, by affirmatively negating an essential

---

[4]We emphasize these are the relevant considerations in the specific circumstances of this case. *See Ercegovich*, 154 F.3d at 352. The requirements of Ms. Hartman's position, her authority and responsibility, and the steps she took, or failed to take, are relevant due to the nature of the operational policy she violated. Had the policy at issue concerned employee conduct that was not related to operational matters at the University; if, for example, this case involved a policy prohibiting employee drug use, our analysis concerning the relevant aspects of Ms. Hartman's employment versus Mr. Parks's would not necessarily have involved the same considerations addressed in this opinion.

element of Plaintiff's claim, that it is entitled to judgment as a matter of law. We therefore affirm the grant of summary judgment in favor of the Board of Regents.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Sharon Hartman.

_____
FRANK G. CLEMENT, JR., JUDGE