IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2011 Session

## LARRY D. WILLIAMS v. CITY OF BURNS, TENNESSEE

**Appeal from the Circuit Court for Dickson County**
**No. 22CC2008CV70      Robert E. Burch, Judge**

---

**No. M2010-02428-COA-R3-CV - Filed February 15, 2012**

---

A former employee brought a retaliatory discharge action against the employer city, asserting a claim under the Tennessee Public Protection Act. The trial court granted summary judgment in the city's favor and the employee appealed. Because genuine issues of material fact preclude summary judgment, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Phillip Leon Davidson, Nashville, Tennessee, for the appellant, Larry D. Williams.

Fetlework S. Balite-Panelo and Stephen W. Elliott, Nashville, Tennessee; and Timothy Valton Potter, Dickson, Tennessee; for the appellee, City of Burns, Tennessee.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

The appellant, Larry D. Williams ("Mr. Williams"), is a former Burns, Tennessee Police Captain. Around ten o'clock in the evening of March 21, 2008, Mr. Williams, who was on patrol, caught the sixteen-year-old stepson of Burns's then-Chief of Police, Jerry D. Sumerour, Jr. ("Mr. Sumerour"), zooming down Highway 47 East at 33 miles per hour over the speed limit. The traffic stop took place close to Mr. Sumerour's home, and Mr. Williams immediately telephoned Mr. Sumerour to inform him about it. Mr. Sumerour met Mr. Williams at the scene, and Mr. Williams then issued two citations, one for speeding and one for reckless driving.

Later that evening and at Mr. Sumerour's direction, Mr. Williams, under protest, changed the citations against Mr. Sumerour's stepson to warnings and two days later told the Burns City Mayor that he felt pressured by Mr. Sumerour to do so. On March 27, 2008, upon hearing about Mr. Williams's conversation with the Mayor, Mr. Sumerour sent Mr. Williams a copy of the police department's organizational chart under which he wrote, "Captain, I strongly suggest you learn this! No where [*sic*] do I see Mayor listed in your chain of command. If you go outside your chain of command again, you will be terminated." On or about that same day, the Mayor advised Mr. Sumerour to have his stepson's citations reissued or risk termination. On March 28, 2008, Mr. Sumerour met with Mr. Williams and instructed him to reissue the citations to his stepson. Mr. Williams reissued the citations and they were ultimately filed with the juvenile court as citations, not warnings.

On April 9, 2008, Mr. Sumerour terminated Mr. Williams, citing violation of policy and procedure and insubordination as the reasons. Mr. Sumerour and the appellee, City of Burns, have stated that Mr. Williams's going outside the chain of command, openly criticizing and disagreeing with a police superior, and openly refusing to attend a meeting arranged by the Mayor to discuss issues between Mr. Williams and Mr. Sumerour are the infractions that led to his termination.

Mr. Williams filed a complaint against the City of Burns on May 2, 2008, alleging retaliatory discharge pursuant to the Tennessee Public Protection Act ("TPPA"), also called the "Whistleblower Act," Tennessee Code Annotated § 50-1-304. In its September 18, 2008 answer, the City of Burns denied liability and asserted affirmative defenses. Mr. Williams filed an amended complaint on June 8, 2009, adding a common law retaliatory discharge claim. On November 20, 2009, the City of Burns filed a motion for partial summary judgment seeking to dismiss the common law claim, asserting immunity under the Tennessee Governmental Tort Liability Act.[1] By order entered December 10, 2009, the trial court dismissed Mr. Williams's common law retaliatory discharge claim with prejudice, noting that Mr. Williams agreed with this decision. Upon proper motion, the trial court granted the City of Burns summary judgment on Mr. Williams's TPPA retaliatory discharge claim by order entered October 21, 2010. Mr. Williams appeals from the order of summary judgment that dismissed his TPPA claim.

STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment

---

[1] Tennessee Code Annotated § 29-20-101 *et seq.*

decision as a question of law. *Id.* Accordingly, we must review the record de novo and make a fresh determination of whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993).[2][3]

The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Byrd,* 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Id.* To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must either: "(1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan*, 270 S.W.3d at 8-9.[4] It is not enough for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." *Id*. at 10. "Similarily, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient." *Martin*, 271 S.W.3d at 84. If the moving party fails to satisfy its initial burden of production, the court should dismiss the motion for summary judgment. *Hannan*, 270 S.W.3d at 5. We consider the evidence presented in support of and in opposition to a motion for summary judgment in the light most favorable to the nonmoving party, resolve all inferences in that party's favor, and discard all countervailing evidence. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002); *Byrd,* 847 S.W.2d at 210-11. The "grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion." *Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18, 26 (Tenn. 2011) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

---

[2] Recently, in *Gossett v. Tractor Supply Co. Inc.*, 320 S.W.3d 777, 785-86 (Tenn. 2010), and in *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 801 (Tenn. 2010), our state Supreme Court held that the *Hannan* summary judgment standard applies in retaliatory discharge cases and expressly rejected the federal *McDonnell Douglas* framework.

[3] We note that the recent amendment to the TPPA, Tennessee Code Annotated section 50-1-304(g), and the enactment of section 50-1-701 are inapplicable to the case before us because they apply to causes of action accruing on or after June 10, 2011.

[4] The enactment of Tennessee Code Annotated § 20-16-101 (2011), which is intended to replace the summary judgment standard adopted in *Hannan*, is inapplicable to this case. *See Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18, 25, n. 2 (Tenn. 2011) (noting that section 20-16-101 is only applicable to actions filed on or after July 1, 2011).

ANALYSIS

Mr. Williams claims that the City of Burns terminated him in violation of the TPPA, also known as the Whistleblower Act, which requires that no employee be discharged or terminated solely for refusing to participate in or refusing to remain silent about illegal activities. Tenn. Code Ann. § 50-1-304(b). To prevail, a Whistleblower Act plaintiff must prove:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about illegal activity.

*Sykes,* 343 S.W.3d at 27; *see also Boyd v. Edwards & Assocs., Inc.,* 309 S.W.3d 470, 473 (Tenn. Ct. App. 2009) (quoting *Voss v. Shelter Mut. Ins. Co.,* 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997)). The City of Burns asserts that Mr. Williams cannot prove the second and fourth of these elements at trial[5] and, as the moving party, it bears the burden of demonstrating that there exists no genuine issue of material fact as to these two elements.

1. Refusal to Participate in or Remain Silent About Illegal Activity

Regarding Mr. Williams's refusal to participate in or remain silent about illegal activity, the City of Burns argues in support of its motion for summary judgment that no illegal activity occurred in this case and relies on *Forrest v. City of Ridgetop*, No. M2002-01176-COA-R3-CV, 2003 WL 21954195 (Tenn. Ct. App. Aug. 15, 2003). In *Forrest*, the plaintiff police officer alleged, *inter alia*, that he was terminated "in retaliation for his refusal to obey a directive from [the Mayor] to dismiss a traffic ticket that he wrote to . . . a purported friend of the Mayor" and "in retaliation for speaking with the TBI regarding his allegation that [the Mayor] had urged him to give traffic warnings, rather than traffic citations, to citizens of Ridgetop." *Id*. at *3. The *Forrest* court concluded that the activities Mr. Forrest complained of could "in no way be considered 'illegal activities' within the meaning of [the Whistleblower Act]." *Id*. at *6.

---

[5] The first and third of these elements are not in dispute.

-4-

The Whistleblower Act defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3). Tennessee Code Annotated section 55-10-204(a) states: "Any person who cancels or solicits the cancellation of any traffic citation . . . commits a Class C misdemeanor." Furthermore, sections 39-16-402(a)(1) and (d) indicate that a public servant who, with the intent to obtain a benefit or to harm another, intentionally or knowingly "[c]ommits an act relating to the servant's office or employment that constitutes an unauthorized exercise of official power" commits a Class E felony. We find as a matter of law that the "ticket-fixing" complained of in the instant case constitutes an illegal activity within the meaning of Tennessee Code Annotated section 50-1-304(a)(3).[6] We decline to follow *Forrest* to the extent that it is inconsistent with a determination that ticket fixing is an illegal activity.

Having found that ticket fixing is an illegal activity within the meaning of the Whistleblower Act, we will briefly address Mr. Williams's refusal to participate in or remain silent about such activity. In its brief, the City of Burns points only to Mr. Williams's admission in his deposition testimony that no one in the City ever asked him to remain silent about altering tickets. Such evidence neither affirmatively negates the essential second element of Mr. Williams's Whistleblower Act claim nor shows that he cannot prove it at trial. Even if Mr. Williams was not asked to remain silent about the ticket fixing, the evidence shows that he refused to participate in it. He testified as follows:

Q. Okay. So this incident arose, if I understand correctly, from Chief Sumerour's stepson getting pulled over for a speeding ticket. And did he ask you to change those citations to warnings?

A. Who?

Q. Chief Sumerour.

A. Yes, he did. He didn't ask me. He told me.

Q. Okay. Did you refuse to change the citations to warnings?

A. I did.

Q. Okay. But you did eventually change the citations to warnings.

---

[6] Indeed, Mr. Williams and Mr. Sumerour were each charged with illegal solicitation to cancel a citation. The charges were eventually dismissed.

A. Yes.

Q. So when you say refused, how did you go about doing that?

A. I told him that I would do it under protest, and I explained to him for probably 20 or more minutes why he should not do it, losing him a job, my job, it was unprofessional, we could both lose our jobs, both be arrested. And it got to the point and when I took my captain's badge off, and I laid it on the desk, and I told him that I would– you know, that I felt pressured, and that I was going to do it under protest. And before that happened, I asked him if I don't fix the tickets for you or write warning on there, are you going to fire me, suspend me, or counsel me, and he would never answer the question.[7] So I felt a great deal amount of pressure that led up to the citations being whited out.

Q. So you didn't completely refuse, did you?

A. I did refuse.

Q. But, eventually, you whited them out?

A. Under pressure.

Q. Did anyone from the City ever ask you to remain silent about altering the tickets?

A. No.

Mr. Sumerour's own testimony lends credibility to Mr. Williams's claim that he refused to participate in altering the citations:

Q. All right. And was it written that these were written as citations, or warnings, or how was it classified?

---

[7] In contrast, Mr. Sumerour testified: "[Mr. Williams] took his badge off, laid it up on the dash of his patrol car, asked me if he was going to receive any repercussions if he refused to make [the citations] warnings, and *I told him, no*."

A. They were originally written as citations. I asked Captain Williams if he could make them a warning, and he did. The next day he decided that he didn't want to make them warnings anymore.
...

Q. Do you know when the word, warning, was written on both citations?

A. I think it was written on there the–maybe the 22nd, maybe the 23rd. Actually, if you can–you can tell here the–it's got white-out on it.

Q. White-out above the word warning–

A. Above the word warning on both citations. Because originally Captain Williams had written, Warning, on them and then he had gone back and whited them out, saying, no, he didn't want to make them warnings anymore. Then I wrote the warning on the second part [of the citation] there.

Upon our careful review, taking the strongest legitimate view of the evidence and allowing all reasonable inferences in Mr. Williams's favor and discarding all countervailing evidence, we find that the City of Burns failed to affirmatively negate the second element of Mr. Williams's claim or to show that he cannot prove it at trial. Therefore, summary judgment was inappropriate, based upon this element of the claim.

2. Termination Solely for Refusal to Participate in or Remain Silent About Illegal Activity

We now turn to the hotly disputed fourth element, causation, that is whether Mr. Sumerour terminated Mr. Williams solely for his refusal to participate in or remain silent about the illegal ticket fixing. Because it is the party moving for summary judgment, the City of Burns bears the burden of showing that no genuine issue of material fact exists as to Mr. Williams's Whistleblower Act claim. *See Martin*, 271 S.W.3d at 83. The City of Burns contends that Mr. Williams "could not credibly argue that his termination was solely because of his refusal to alter the citations," and insists that Mr. Sumerour fired him for violation of policy and procedure and insubordination, namely, going outside the chain of command, openly criticizing and disagreeing with a police superior, and openly refusing to attend a meeting arranged by the Mayor to discuss their issues. Mr. Williams contends that these reasons are pretextual.

### a. Going Outside the Chain of Command

To show that Mr. Williams disregarded the chain of command when he spoke with the Mayor about Mr. Sumerour's actions, the City of Burns points to its police department's organizational chart which Mr. Sumerour included in the March 27, 2008 note to Mr. Williams. On the chart, Chief of Police (Mr. Sumerour's former position) is first; Captain (Mr. Williams's former position) is right below. However, Mr. Williams maintains that the Mayor was in his chain of command:

Q. And by speaking with the Mayor, did you violate that chain of command?

A. To me, he is part of the chain of command. He's my main boss. So I don't feel like I did, no, because he is part of the chain of command. And the situation involving the chief, it's not like dealing with a patrolman where you're above them dealing with a higher authority, then it requires a higher authority, to be talking to them about something unlawful for the department. I don't believe I violated the chain of command.

By his own testimony, Mr. Sumerour admits that the Mayor was in Mr. Williams's chain of command:

Q. . . . My question was, you would agree with me that if an officer had a complaint against you he felt like you weren't going to act on, the next person in the chain of command would be the mayor; wouldn't it?

A. Right.

The City of Burns maintains that Mr. Williams disregarded the chain of command when speaking with the Mayor. Mr. Williams argues the opposite. Mr. Sumerour issued Mr. Williams a written reprimand for speaking with the Mayor yet concedes in his testimony that, under the circumstances of this case, the Mayor was the appropriate person for Mr. Williams to speak with. If Mr. Williams's speaking with the Mayor about Mr. Sumerour did not constitute a disregard of the chain of command, then "going outside the chain of command" was not a proper basis for Mr. Williams's termination. Even if there are facts that allow the City of Burns to argue that Mr. Williams was fired for this reason, there is a genuine issue of material fact precluding summary judgment.

### b. Openly Criticizing and Disagreeing with a Police Superior

To show that Mr. Williams openly criticized and disagreed with Mr. Sumerour, his superior, the City of Burns presents signed statements[8] from three other Burns police officers, Officers Sturgill, Sullivan, and Richardson, as well as Mr. Sumerour's summary of Officers Sturgill's and Sullivan's statements. At the conclusion of his summary, Mr. Sumerour writes, "[a]fter considering all the information gathered the last few days and the statements obtained, I have decided to TERMINATE Capt. Larry Dean Williams IMMEDIATELY. Capt. Williams's comments concerning me over the last few days can not and will not be tolerated. I can not have an employee trying to sabotage the entire department." In his signed statement, Officer Sturgill says:

> On several occasions when someone would make a complaint against me, Capt. Williams would counsel me and he would always [say], '[t]he Chief wanted to fire you, but I talked him out of it' . . . . Capt. Williams had also told me on several occasions that if Burns annexes, and that [*sic*] we hire more Police officers, that I would be promoted to Sargent if he had anything to do with it . . . . This past Saturday, Capt. Williams told me that he no longer had any respect for Chief Sumerour, and that he had told the Mayor that he should fire Chief Sumerour.

In sharp contrast, Officer Richardson's statement (which Mr. Sumerour admitted he read before he terminated Mr. Williams) reads:

> When I spoke with Captain Williams a few weeks ago concerning the situation that had occurred between him and the chief, at no time did Captain Williams <u>ever</u> belittle or put down the chief in any way. He stated to me that 'he and the chief had had a rough week working together,' but that he was still the chief of police and his supervisor and he would continue to work for him as directed."

In addition, Mr. Williams testified on cross examination:

> Q. In between the incident with the citations and your termination, did you go around and talk to any of the city employees about Chief Sumerour?
>
> A. Not that I'm aware.

---

[8] Mr. Sumerour requested these three signed statements, and they were dated April 7, 2008, about two weeks after Mr. Williams cited Mr. Sumerour's stepson for speeding and reckless driving.

Q. Okay. Did you ever talk to any Dickson officers about your feelings about Chief Sumerour?

A. No, I wasn't–I didn't communicate with those officers. I never saw them.

The testimony and conflicting affidavits in the record present a genuine issue of material fact as to whether Mr. Williams openly criticized and disagreed with Mr. Sumerour. This genuine factual issue "can be resolved only by a trier of fact because [it] may reasonably be resolved in favor of either party." *Byrd,* 847 S.W.2d at 212 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). Resolving this issue will require the evaluation of credibility, which cannot be done on summary judgment. *See Hagan v. Phipps*, No. M2010-00002-COA-R3-CV, 2010 WL 3852310, at *5 (Tenn. Ct. App. Sept. 28, 2010) (no Tenn. R. App. P. 11 perm. app. filed).

c. Openly Refusing to Attend Meeting

Mr. Williams does not dispute the fact that he did not attend the meeting with Mr. Sumerour and the Mayor, but it is unclear whether Mr. Williams was *required* to attend:

Q. Were you ever asked to meet with the chief and mayor regarding the citations?

A. No.

Q. Okay. Did you ever say that you didn't want to meet with the chief and mayor regarding the citations?

A. The meeting was supposed to be between the mayor, me, and the chief. *And I was not command directed to be at a meeting*. I didn't attend a meeting. *And the mayor was okay with it*. He had called me and asked me about it [*sic*] showing up with [*sic*] a meeting with him and the chief, and I told him I just didn't think it would be a good time for me to be in a meeting with him right now because of everything that had transpired.

Q. So you were asked to go to a meeting.

A. Not over the tickets, no.

Q. Were you asked to meet with–but you were asked to meet with the chief and the mayor?

A. Yes, ma'am.

(Emphasis added).  Regardless of whether Mr. Williams was required to attend the meeting, the City of Burns does not allege and the record does not indicate that Mr. Williams's refusal to attend, standing alone, was sufficient grounds for termination.  The City of Burns argues that Mr. Williams "committed a number of infractions of police department policies which ultimately led to his termination for violation of policy and procedure and insubordination. These violations were-going outside the chain of command, openly criticizing and disagreeing with a police superior, and openly refusing to attend a meeting arranged by the mayor to discuss issues between [Mr. Williams and Mr. Sumerour]."  We have examined the record in depth, and it indicates that Mr. Sumerour terminated Mr. Williams based on the sum of these alleged infractions and not any one of them alone.  As explained above, genuine issues of material fact preclude summary judgment as to the reasons behind Mr. Williams's termination.

CONCLUSION

In sum, based on our careful review of the entire record, we have determined that there are several genuine issues of material fact regarding the actual motivation behind Mr. Williams's termination and that the City of Burns did not affirmatively negate the second element of Mr. Williams's claim.  It is worth noting that the undisputed facts show that Mr. Williams had never been disciplined prior to the days leading up to his termination, that Mr. Sumerour chose to promote Mr. Williams from patrolman to captain one year before his termination, and that the two men were close friends outside of work.  We have taken the strongest legitimate view of the evidence, allowed all reasonable inferences in Mr. Williams's favor, and discarded all countervailing evidence; and based on the facts, a reasonable person could reach more than one conclusion as to whether Mr. Williams was terminated solely for his refusal to participate in or remain silent about illegal activity. Summary judgment was inappropriate, and we accordingly reverse the trial court's decision.

Costs of appeal are assessed against the City of Burns.

_____
ANDY D. BENNETT, JUDGE