IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2013 Session

## LARRY D. WILLIAMS v. CITY OF BURNS, TENNESSEE

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2008-CV-70      Robert E. Burch, Judge**

---

**No. M2012-02423-COA-R3-CV - Filed, August 12, 2013**

---

A police officer who was terminated for violating chain of command and insubordination filed suit for retaliatory discharge pursuant to Tenn. Code Ann. § 50-1-304, alleging that he had been terminated for reporting illegal activities of the Police Chief to the Mayor. Following a trial, the court held that the evidence did not establish that the officer had been terminated solely for his refusal to remain silent about the illegal activities. Finding that the reasons given for the officer's termination were pretextual within the meaning of the applicable statute, we reverse the judgment of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. PATRICIA J. COTTRELL, P. J., M. S., not participating.

Phillip L. Davidson, Nashville, Tennessee, for the Appellant, Larry D. Williams.

Stephen W. Elliott and Fetlework Balite-Panelo, Nashville, Tennessee, for the Appellee, City of Burns, Tennessee.

## OPINION

This retaliatory discharge case brought by Larry Williams, a former captain with the City of Burns Police Department, asserting a claim under the Tennessee Public Protection Act ("TPPA"), comes before us for the second time. In the first appeal, we reversed the grant of summary judgment to City and remanded the case for trial on the merits. *Williams v. City of Burns, Tennessee*, No. M2010-02428-COA-R3-CV, 2012 WL 504511 (Tenn. Ct. App.

Feb. 15, 2012) appeal denied (May 21, 2012). Trial was held on August 30, 2012, and on September 10 the court entered judgment in favor of the City.

The facts giving rise to the claim are set forth in the earlier opinion:

The appellant, Larry D. Williams ("Mr. Williams"), is a former Burns, Tennessee Police Captain. Around ten o'clock in the evening of March 21, 2008, Mr. Williams, who was on patrol, caught the sixteen-year-old stepson of Burns's then-Chief of Police, Jerry D. Sumerour, Jr. ("Mr. Sumerour"), zooming down Highway 47 East at 33 miles per hour over the speed limit. The traffic stop took place close to Mr. Sumerour's home, and Mr. Williams immediately telephoned Mr. Sumerour to inform him about it. Mr. Sumerour met Mr. Williams at the scene, and Mr. Williams then issued two citations, one for speeding and one for reckless driving.

Later that evening and at Mr. Sumerour's direction, Mr. Williams, under protest, changed the citations against Mr. Sumerour's stepson to warnings and two days later told the Burns City Mayor that he felt pressured by Mr. Sumerour to do so. On March 27, 2008, upon hearing about Mr. Williams's conversation with the Mayor, Mr. Sumerour sent Mr. Williams a copy of the police department's organizational chart under which he wrote, "Captain, I strongly suggest you learn this! No where [*sic*] do I see Mayor listed in *your* chain of command. If you go outside your chain of command again, you will be terminated." On or about that same day, the Mayor advised Mr. Sumerour to have his stepson's citations reissued or risk termination. On March 28, 2008, Mr. Sumerour met with Mr. Williams and instructed him to reissue the citations to his stepson. Mr. Williams reissued the citations and they were ultimately filed with the juvenile court as citations, not warnings.

On April 9, 2008, Mr. Sumerour terminated Mr. Williams, citing violation of policy and procedure and insubordination as the reasons. . . .

*Williams v. City of Burns*, 2012 WL 504511 at *1.[1]

---

[1] The facts recited in the prior appeal were taken from materials filed in support of and in opposition to the City's motion for summary judgment; the testimony and other evidence at trial was consistent with the factual history set forth in the prior appeal.

In granting judgment to the City, the trial court held that Mr. Williams "failed to establish under the [TPPA] that [the City's] motivation for the discharge of his employment was based solely on his refusal to participate in the alleged illegal activity."

Mr. Williams appeals, articulating the issues as follows:

1. Did not the court err in ruling that Plaintiff was not terminated solely for refusing to fix traffic tickets for his Chief of Police?
2. Did not the preponderance evidence presented at trial prove that the Defendant's sole reason for terminating the plaintiff was his refusal to fix traffic tickets and that Defendant's proffered reasons for termination were pretextual.

## I. STANDARD OF REVIEW

Because this case was tried without a jury, our review of the trial court's findings of fact is *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Our review of the trial court's determinations regarding questions of law is *de novo* with no presumption of correctness. *See Staples v. CBL Associates, Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).

## II. DISCUSSION

The TPPA , also referred to as the "Whistleblower Statute," Tenn. Code Ann. § 50-1-304, is the codification of the common law claim of retaliatory discharge; the Act prohibits the "discharge or termination of an employee for refusing to participate in or for refusing to remain silent about illegal activities." *Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 735 (Tenn. 2011); Tenn. Code Ann. § 50-1-304(b). The essential elements for a cause of action under the TPPA are:

(1) the plaintiff's status as defendant's employee; (2) the plaintiff's refusal to participate in or remain silent about illegal activities; (3) the defendant employer's discharge or termination of the plaintiff; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the defendant employer's discharge of the plaintiff.

*Id.* (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn.2011); *see also Boyd v. Edwards & Assoc.*, 309 S.W.3d 470, 473 (Tenn. Ct. App. 2009); *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997)).

Tenn. Code Ann. § 50-1-304(g) sets forth the procedure for resolving a claim arising under the TPPA and the respective burdens that the parties bear:

> [T]he plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. . . . The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

In ruling from the bench, the court discussed the elements of the TPPA cause of action and concluded:

> The difficult one is the last one. An exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.
> * * *
> All of these factors, the factors that were put in for both sides are intricately interwoven. I don't think there's any question but what the plaintiff's initial refusal to modify this ticket, fix this ticket, so to speak, was a factor in his discharge. I don't have a problem accepting that at all. And it's even likely that this refusal began the investigation which ultimately lead to his discharge.

> The proof establishes, however, that the plaintiff had in fact been disloyal to his superior, the chief of police, by subverting or attempting to subvert the loyalty of his officers. And that's testified to by more than one officer.

> Another factor may have been the violation of the chain of command. But I have a little problem here, and I'm going to differentiate that in a moment. There is no proof as to what the chain of command procedure was when the complaint was against the chief.

> Former Chief Suremour testified to what he believed the proper procedure would have been, but there's no indication that this was known or communicated to the rank and file.

4

In summary the plaintiff was discharged for refusing to participate, but also for subverting the authority of the chief and the violation of the chain of command. All these violations arose from the initial refusal. As I say, they're all intertwined. But they are separate instances. And the chain of command may not have been sufficient for a legal termination, but the Court finds it was an actual reason for termination, as I say, in addition to the disloyalty.[2]

While we agree with the factual finding that the circumstances surrounding the modification of the tickets the ticket was a factor in plaintiff's discharge, for the reasons set forth below, the evidence does not support the determination that plaintiff's discharge was not in contravention of Tenn. Code Ann. § 50-1-304(b).

## A. CHAIN OF COMMAND

The purpose of the TPPA is to protect employees who refuse to violate a statute, regulation or rule, but also who report the illegal activities of their employer to the proper authorities. *See Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn. 1997); *Wooley v. Madison County*, 209 F.Supp.2d 836, 844 (W.D.Tenn. 2002) (citing *Henderson v. Corrs. Corp. of Am.*, 918 F.Supp. 204, 210 (E.D.Tenn.1996); *Merryman v. Cent. Parking Sys., Inc.*, No.

---

[2] The court stated the following relative to the first three elements:

First, that the plaintiff's status as an employee of the defendant, and that's admitted.

Second, that the plaintiff's refusal to participate in or remain silent about illegal activities is defined under the Act. The Court rules that the alteration of the traffic citation was an illegal act, and I know that the statute that makes an alteration of a ticket illegal says, Or solicits the cancellation of any traffic citation. I'm of the opinion that making it a warning is a cancellation, so it didn't even have to be altered for this to be an illegal act, but it was. So it was most definitely an illegal act as defined under the Act.

The plaintiff initially refused to participate in fixing the ticket, but later relented. But that's enough to bring it under the statute. There's no proof that he was required to be silent, asked to be silent, did remain silent, didn't remain silent. Seems to me there was a whole lot of talking about this. So the silence factor just does not apply. It's whether he refused to participate. And again, he initially, the Court finds as a matter of fact, that he initially refused to participate.

Third, he was discharged by his employer, and that is admitted by all parties.

The evidence supports these findings. In the earlier opinion we found that "the 'ticket-fixing' complained of in the instant case constitutes an illegal activity within the meaning of Tennessee Code Annotated section 50-10304(a)(3)." *Williams,* 2012 WL 504511 at *3.

5

01A01–9203–CH–00076, 1992 WL 330404 (Tenn.Ct.App. Nov. 13, 1992)). In order to fulfill its purpose, the statute contemplates that there be a mechanism in place for employees to report the illegal activities of their employer.

In this case, the only testimony relating to any such reporting mechanism was the chain of command testified to by Mr. Sumerour, i.e., the "open door policy" he maintained which provided that employees come talk with him before talking to the mayor.[3] Under the circumstances presented, however, this policy would require Mr. Williams to report the conduct to Mr. Sumerour, the person who had directed that Mr. Williams perform the illegal activity; this would be contrary to the clear intent of the statute for employees to report illegal activity and to be protected when they do so. As our Supreme Court noted in *Mason v. Seaton*, "[i]t is axiomatic that an employer who is engaged in illegal activity does not want that activity reported to those officials who are responsible for enforcing the law." 942 S.W.2d at 475.

By its very nature, the chain of command testified to by Mr. Sumerour could not function to fulfill the purpose of the statute where Mr. Sumerour's activities were being called into question. The communication between Mr. Williams and the Mayor is protected by the statute irrespective of the chain of command and Mr. Williams' asserted violation of the chain of command cannot serve as a ground for his termination consistent with the TPPA.

---

[3] Mr. Suremour testified relative to the chain of command violation:

Q: One of your reasons for terminating Mr. Williams is that he didn't follow chain of command; is that correct?
A: Correct.
***
Q: So one of the reasons that you used to terminate Mr. Williams (sic) in fact, is not valid. He never violated the chain of command, did he?
A: Well, the open door policy that I had as chief of police, every officer that worked for me at the time knew that if they had a problem with me they would could come talk to me. If they didn't get the right resolution that they needed, then they could go to the mayor. Mr. Williams did not come to me before going to the mayor.
Q: Well, my question to you was, you admitted in your deposition that in this situation he hadn't violated chain of command, didn't you?
A: What I admitted was that if he had a problem with me, he could go to the mayor.
Q: Well, he had a problem with you and went to the mayor, didn't he?
A: He didn't come to me either, right.

The trial court expressed a reservation that this procedure "was known or communicated to the rank and file."

6

The court found that this was an actual reason for Mr. Williams' termination and, for the reasons stated, that reason cannot stand.

## B. INSUBORDINATION

We now address the court's holding that Mr. Williams was terminated for subverting the authority of Mr. Sumerour, conduct which was characterized by Mr. Sumerour as insubordination, and consider whether the evidence shows that this asserted reason for the termination was pretextual.

This court in *Versa v. Policy Studies, Inc.*, a case in which the plaintiff sought to recover for an alleged racially discriminatory termination, set forth the framework in which evidence of pretext was to be considered, a framework we find to be equally applicable to a claim of retaliatory discharge:

> A plaintiff may establish pretext in one of three ways: by showing "(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [the employee's] discharge, or (3) that they were *insufficient* to motivate discharge."

> An employer's proffered reason for termination of an employee has no *basis in fact* if "the employer's proffered non-discriminatory reasons for [the employee's] demotion or discharge are factually false." The question is not whether the employer's decision was sound, but whether the employer's asserted reason for the adverse employment decision is pretextual. The reasonableness of an employer's decision may be considered, but only so far as it "illuminates the employer's motivations. The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext."

> In attempting to show that a defendant's proffered reason did not *actually* motivate discharge, a plaintiff may either (1) produce evidence that the adverse employment decision was more likely motivated by discrimination, or (2) show that the employer's explanation is not credible.

> To show that a defendant's proffered reason is *insufficient* to motivate discharge, a plaintiff must produce "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff."

7

*Versa*, 45 S.W.3d 575at 581 (Tenn. Ct. App. 2000) (internal citations omitted) (emphasis in original).

The evidence of insubordination consisted of Mr. Suremour's testimony that "the insubordination was the biggest factor with [Mr. Williams] going around the chain of command, going to the mayor, and bad-mouthing me to the other officers" and that Mr. Williams was "terminated for insubordination for not following policy" and for "statements by others officers." Admitted through the testimony of Mr. Sumerour were written statements from three other police officers: Officer Tase Sturgill, Officer Stephen Sullivan, and Officer Ed Richardson. No policy manual or employee handbook defining or detailing a policy for sanctioning insubordination or, indeed, any performance related conduct was introduced; neither was there any testimony relative to specific policies regarding insubordination.

Officer Richardson's statement contained the following relevant excerpt:

I am making this statement in the hope that it will help in putting to rest the friction and tension here at the Burns P.D. When I spoke with Captain Williams a few weeks ago concerning the situation that occurred between he and the Chief, at no time did Captain Williams ever belittle or put down the Chief. He stated to me that "he and the Chief had a rough week working together" but that he (Chief) was still the chief of police and his supervisor, and he would still continue to work for him as directed. He did state to me to "continue to do the job I was hired to do and that things would eventually work themselves out."

I work for the Burns Police Dept. And am proud to be a member of this fine department. I have the utmost respect for Chief Sumerour and Capt. Williams and for the leadership and professionalism of both. I only hope that this situation can and will soon be resolved for the good of this department and the citizens of Burns.

Officer Sullivan's statement contained the following:

[P]er your request this statement is about a conversation that Captain Williams and I had last week. Captain Williams had discussed a traffic stop he had with your son and advised that it didn't go so well. Captain Williams went into some detail concerning the law side of the stop and asked my opinion on the stop. I advised him of my thoughts about the situation and wished that the situation could be resolved. Captain Williams did asked me [sic] if something

8

did happened [sic] to you and if they asked him to be Chief would I step up and be the captain. I advised Captain Williams, as well as I would advise you, if any one of you asked me to be the Captain I would say yes and that I would thank anyone of you for thinking that highly of me and that I would do my best. Captain Williams did say that he hoped it didn't come out to that Chief. Like I said when you hired me "I am not after anybody's job."
I really think that Captain Williams had trust in me as a fellow officer for which he has known for over twenty years and also as a friend. I don't want to betray you or the Captain as a subordinate, fellow officer or friend. I hope that all of this can be worked out. I will help in any way possible.

Officer Sturgill's statement was also read into the record:

On several occasions when someone would make a complaint against me, Capt. Williams would counsel me and would always make the statement, "The Chief wanted to fire you, but I talked him out of it Tase." Capt. Williams always stressed this, even in normal conversation. Capt. Williams had also told me on several occasions that if Burns annexes, and we hire more police officers, that I would be promoted to Sargent [sic] if he had anything to do with it.
In the last couple of weeks, Capt. Williams has told me his version of events about stopping Chief Sumerour's step-son Cody. This past Saturday, Capt. Williams told me he no longer had any respect for Chief Suremour, that he had told the mayor that he should fire Chief Suremour. He also stated that as far as he (Capt. Williams) is was concerned Chief Suremour is nothing more than his boss, and there is no way he could salvage any respect for Chief Suremour. I told Capt. Williams that I didn't want to be drawn into this, as I had respected both him and the Chief.

Viewed in light of the entire circumstances surrounding the termination of Mr. Williams, and applying the analytical framework set forth in *Versa*, we conclude that basing Mr. Williams' termination on the conclusion that he was insubordinate to Mr. Sumerour has no basis in fact and did not actually motivate Mr. Sumerour to terminate him; to the contrary, the preponderance of the evidence shows the contention that Mr. Williams was guilty of insubordination was a pretext for unlawful retaliation.

Mr. Sumerour testified that he asked the officers to prepare the statements shortly before making the decision to terminate Mr. Williams. He did not state why he solicited the statements and we can discern no reason for Mr. Sumerour to make the request. In light of the fact that it was Mr. Sumerour's conduct that precipitated the sequence of events, along

9

with the absence of employment policies and procedures directing how matters like this would be handled, we are led to question Mr. Sumerour's motives, particularly inasmuch as we are interpreting and applying a statute which is intended to encourage the type of report Mr. Williams made. Considering the entire circumstances of this matter, to assert that Mr. Williams was insubordinate on the basis of the remarks attributed to him is simply not credible.

Moreover, we have determined that Mr. Williams' sentiments, as reflected in the Officer's statements do not constitute insubordination, which is defined as "disobedient." *See* Webster's II New College Dictionary, Third Edition.[4] The statements contain comments that Mr. Sumerour determined were critical of him and he determined that the comments constituted grounds for termination. The comments, however, while critical of Mr. Sumerour, are Mr. Williams' feelings and opinions and do not constitute disobedience to or defiance of Mr. Sumerour or his authority as Chief of Police. Thus, there is no basis in fact for this asserted ground for Mr. Williams' termination.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and remand the matter for a hearing on the relief due Mr. Williams.

_____
RICHARD H. DINKINS, JUDGE

---

[4] We use this definition in the absence of any policy of the City of Burns or the Burns Police Department defining the term for employment or job performance purposes.