NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0919n.06

No. 13-5326

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JUDY CANADY,                                )
                                            )
        Plaintiff-Appellant,                )
                                            )
v.                                          )      ON APPEAL FROM THE UNITED
                                            )      STATES DISTRICT COURT FOR
THE GILLETTE COMPANY,                       )      THE    EASTERN  DISTRICT  OF
                                            )      TENNESSEE
        Defendant-Appellee.                 )
_____       )
                                            )      OPINION

FILED
Oct 24, 2013
DEBORAH S. HUNT, Clerk

Before:  ROGERS, GRIFFIN, and DONALD, Circuit Judges.

        **BERNICE B. DONALD, Circuit Judge.**  Plaintiff-Appellant Judy Canady appeals an order

of the district court granting summary judgment on her state-law retaliatory discharge claim in favor

of Defendant-Appellee, The Gillette Company ("Gillette").

        Canady  originally sued Procter & Gamble, Gillette's parent company, in Tennessee state

court alleging a single claim of retaliatory discharge under Tennessee common law, asserting that

Gillette fired her in retaliation for her suffering a "recordable" workplace injury.  On March 11,

2011, Procter & Gamble removed the case to the United States District Court for the Eastern District

of Tennessee on grounds of diversity.

On July 17, 2012, Gillette, who had been substituted for Procter & Gamble in Canady's second amended complaint, moved for summary judgment, asserting that Canady was unable to establish a prima facie case of retaliatory discharge. Gillette argued in the alternative that, even if Canady had established a prima facie case, the company was still entitled to summary judgment because it had offered legitimate non-retaliatory reasons for her discharge, which Canady could not prove were pretextual. Canady opposed this motion. Gillette's reply argued, among other things, that Canady's response primarily relied on inadmissible hearsay evidence.

On March 1, 2013, the district court granted Gillette's motion for summary judgment on Canady's retaliatory discharge claim and dismissed the case. At the outset of its order, the district court specifically noted that Canady's support for her factual allegations was largely inadmissible hearsay and thus could not be considered by the court. This appeal ensued.

For the reasons articulated below, Canady has not established a prima facie claim for retaliatory discharge under Tennessee common law. Accordingly, we **AFFIRM** the district court's grant of summary judgment to Gillette.

I.

In 1975, Canady began working on the assembly line at a Duracell battery plant in Cleveland, Tennessee, which Gillette purchased in 2005. For the next thirty-five years, Canady worked for Gillette and its predecessors, finishing her career as a materials handler/technician. During that time, Canady suffered a number of work-related injuries, including a 2006 knee injury

that required surgery and resulted in a $10,000 workers' compensation settlement. None of Canady's prior work-related injuries led to disciplinary action.

Canady worked in the Pack Center, one of two plants at the Duracell site. The Pack Center's employee structure included technicians like Canady, line leaders, team leaders, and shift leaders. Department managers, referred to as "ODLs," oversaw these employees; Canady's ODL was Roger Watkins. All the ODLs reported to NaKeia Grimes, the plant's operations and business leader, who, in turn, reported directly to Plant Manager Bill Barkley, the only person with authority to terminate employees.

Gillette policy required that employees schedule their planned vacation time at the outset of each year. Employees could, however, retain some vacation days to use as unplanned or "emergency" vacation. This unplanned time allowed employees to use a vacation day in exchange for being paid when they needed to miss work on short notice. As of 2010, the "Pack Center Vacation Scheduling Process & Principles" provided that "[u]nplanned vacation should be requested within 48 hour notice and requires shift leader and leadership approval." According to Canady, she learned about these vacation policies at a meeting in January 2010.

The plant's written policies did not specify the method by which employees had to request and obtain approval for emergency vacation time. According to Watkins and Grimes, the "emergency vacation process" required employees to call a phone number and then complete an emergency vacation form within twenty-four hours of their return to work. More than one

employee, however, stated that they had neither seen nor heard of this form. A former ODL indicated that employees could request emergency vacation in several ways: over the telephone, by logging a vacation day in the "vacation book," by completing an emergency vacation request form to submit to the employee's ODL, or by entering the vacation time into Gillette's computer timekeeping system ("SAP"). Just as there were no written policies explaining how to request emergency vacation time, there were no written guidelines to aid ODLs in deciding whether to approve or deny emergency vacation requests.

If an employee took an unplanned day off and failed to secure approval for an emergency vacation day, that missed day would generally be treated as an unpaid absence. Depending on the employee's history, disciplinary action for this absence was possible, but employees stated they had never heard of anyone being punished for merely requesting emergency vacation, even if the request was ultimately denied.

Minutes after she reported to work on Friday, January 22, 2010, Canady received a call from her ninety-four-year-old ex-father-in-law who needed medical care, so Canady tried to take a half day of emergency vacation to transport him to the hospital. At her daily team safety meeting, she attempted to speak to ODL Watkins, but he was not there. On the advice of Michael Haun, a former shift leader and time keeper, Canady went to shift coordinator Tammy Swafford's office. After learning that Swafford was in a meeting, Canady returned to Swafford's office "every hour on the hour" but was still unable to find her. Canady approached Haun again to ask what she should do. Haun suggested she make an entry in both the vacation book and SAP and alert her team leader,

Gerald Barber. Canady logged a half-day personal holiday—another form of time off—in both the vacation book in Swafford's office and SAP, alerted Barber as well as several other employees that she would be leaving, and then departed. Canady did not speak with either Swafford or Watkins before leaving. Canady concedes that she knew Haun could not approve her vacation request but stated that she believed Swafford could.

On Sunday, January 24, 2010, using a borrowed phone, Canady left Watkins a voicemail message explaining that she needed a vacation day on Monday, January 25, to take her ex-father-in-law home from the hospital and arrange for his care. Canady's message asked Watkins to call her back, but she did not leave a return phone number. Because it was off, Watkins's phone did not record the number from which Canady called. Watkins remembered this voicemail but stated that he considered it merely a "courtesy call" alerting him that she would not be at work the next day, so he did not return it. Although other non-managerial Gillette employees claim that Watkins should have returned Canady's call, both Watkins and Grimes indicated that Canady needed to fill out an emergency vacation form before Watkins would have become responsible for responding to her request for emergency vacation time.

The next morning, on January 25, Canady called to speak with Swafford but instead spoke to Jackie Viars, a shift coordinator. Canady stated that she needed to take a vacation day, but Viars instructed Canady to speak to Watkins. When Canady explained that Watkins had not called her back, Viars agreed to leave a message for Swafford.

On Tuesday, January 26, Canady returned to work and coded a vacation day into SAP for her absence the day before; she did not, however, submit a vacation request form. Although Canady saw Watkins that morning, she did not attempt to discuss her absence with him. On Friday, January 29, Swafford met with Canady to verify that Canady's personal time sheets for the pay period that included January 25 matched with the SAP records before submitting the SAP entries to payroll. Canady subsequently received pay for her half personal holiday on Friday, January 22 and vacation day on Monday, January 25.

During the first week of February 2010, Watkins reviewed the payroll variance report from the two preceding weeks and noticed that Canady had been paid for a vacation day that he had not approved. Watkins consulted with Swafford to ensure that he did not "miss something" and "to see if she had any knowledge of [an] emergency vacation request form." Watkins also alerted Simeon Baskerville in Gillette Human Resources that there was "a situation that [Watkins] was going to have to investigate." At this point, although he had not yet spoken to Canady, Watkins understood that he had commenced a formal investigation.

The next week, on Monday, February 8, 2010, Canady was injured by a "tote," a fiberglass container that holds batteries while line workers inspect them. As Canady pushed a button to "call down" a tote, the machine propelled the tote with such force that it "jumped the safety bar and twisted" to hit Canady near her right eyebrow. After neither Canady nor the on-site nurse were able to stanch the ensuing bleeding, an ambulance transported Canady to the hospital where she received a shot of pain medication and eight stitches.

Watkins followed Canady to the hospital and remained with her until her discharge. During the roughly ninety minutes Canady and Watkins were together at the hospital, they talked generally about the medical care Canady was providing for her ex-father-in-law, but the two did not discuss either the accident that had just occurred or Watkins's investigation into Canady's unapproved vacation. While Canady was still in the hospital, Watkins, following what he believed to be company policy after a workplace accident, requested that Canady submit to a drug screen. After her discharge, Watkins drove Canady back to work; Canady then went home for the rest of the day. Because Canady required stitches, her accident qualified as "recordable," meaning that it counted against the plant's safety statistics.

On the afternoon of February 8, after he returned from the hospital, Watkins "did a quick little formal documentation" for the investigation into Canady's unapproved vacation request. Watkins also alerted Grimes of the investigation into Canady's unapproved vacation.

On February 9, 2010, Canady participated in an investigation of the accident that had occurred the day before. According to Canady, while investigations were usually simple one-on-one affairs involving nine questions designed to assess fault, this investigation involved numerous other people including Grimes and a "safety man." At the outset of the investigation, Barry Rinks—a non-managerial employee who served as Canady's line leader—suggested that the accident must have been Canady's fault because he had been putting up totes the same day and had not been similarly injured. The "safety guy," however, concluded that the accident transpired as Canady described. The investigation team ultimately found that Canady was not at fault;

accordingly, she was not written up or disciplined. According to Canady, Grimes appeared irritated that Canady had not been found at fault.

At the conclusion of that investigation, Canady met with Watkins to discuss her unapproved time off; at Watkins's request, Rinks took notes during this meeting. According to Canady, Watkins threw down the time-keeper report and stated that "there's going to be consequences" before ordering Canady to return to her work station. According to Watkins, Canady admitted that she should have talked to him and that both Viars and Swafford had told her to speak to him. Watkins also indicated that Canady stated she knew she should have submitted a vacation form and that she did not know why she had not done so. Both sides agree that Canady said that she had tried to call Watkins, and Watkins acknowledged receiving her voicemail.

Still on Tuesday, February 9, Grimes also met with Canady to discuss her unapproved time off. Grimes's notes from the meeting state that she told Canady that it had been Canady's responsibility to obtain Watkins's approval before coding an absence as vacation. These notes also indicate that Canady had claimed that Haun had approved her for a half day of personal holiday on January 22, that Canady acknowledged that she should have spoken to Watkins before logging her vacation time in SAP, and that Canady did not recall why she did not follow up with Watkins about her emergency vacation request. Although Canady's memory of this conversation is somewhat hazy, she recalls Grimes's asking her about Haun and her explaining that, while she had asked Haun what to do, she was aware that Haun could not approve her emergency vacation. Canady admits that she "probably" told Grimes that she should have spoken to Watkins but counters that she also told

Grimes that Watkins should have spoken to her about whether she could have the day off. At the end of this meeting, Grimes said that she needed to speak with Baskerville and that she would get back to Canady regarding how the situation would be handled.

After this meeting, Grimes spoke to Haun, who stated that he had given Canady advice about to whom she needed to speak but had also explained that he could not approve time off. Grimes then interviewed Swafford, who confirmed that she had verified Canady's time off in SAP but had not approved this time off because, as a shift coordinator, Swafford lacked authority to do so. Grimes also spoke to Barber, Canady's team leader, who reported that Canady had approached him on January 22 to explain that she was going home and that "they" were aware that she was doing so.

The following day, Canady met with Grimes again while Baskerville took notes on the conversation. In that meeting, Grimes again asked Canady who had approved her half-day personal holiday on January 22, 2010. According to Canady, she repeated the instructions that Haun had given her when she could not find Swafford and claimed that Swafford must have approved her vacation time because she had already been paid for those days. The notes from this meeting, however, indicate that Canady had "insisted" that Haun had approved her time off and that Canady claimed to have "worked" her time off with Barber. Grimes advised Canady that Gillette management would consider how to respond to her taking unauthorized personal holiday and emergency vacation time.

That same day, February 10, 2010, Watkins and Grimes completed a Corrective Action Summary Form, which stated that management had encountered a problem with Canady's "Falsification of documentation; Recording unauthorized vacation into SAP & Vacation Log Book and Lying in an Investigation." The description of the incident stated:

> On Sunday, 1/24/10, Judy [Canady] called Roger Watkins and left a voicemail requesting emergency vacation for the following day. On Monday morning [Canady] had not heard back from [Watkins] so she called Jackie Viars to request a personal holiday or emergency vacation. [Viars] told [Canady] she would make note her absence but could not grant her a personal holiday or emergency vacation. [Canady] returned to work to work on Tuesday, 1/26, and record a vacation day in the vacation book for the previous day. She did not talk to [Watkins] as [Viars] instructed (or as outlined in the Pack Center Vacation Scheduling Process and Principles) to get approval for a vacation day. When asked why she did not speak with [Watkins] she said she wasn't sure why but acknowledged that she should have done so.
>
> [Canady] was not truthful in the investigation but it was ultimately discovered that [Canady] recorded unauthorized vacation on 1/22 as well.

On February 15, 2010, Plant Manager Barkley, on the recommendation of Baskerville, Grimes, and Watkins, terminated Canady for falsifying documents (recording unauthorized paid time off) and for lying during the investigation (claiming that either Haun or Barber had approved her half personal holiday). Though Canady's effective termination date was February 15, 2010, she was actually placed on administrative leave until March 1, 2010 so that she could be eligible for early retirement benefits.

After her termination, Canady filed a workers' compensation claim for the injuries she sustained on February 8, 2010. Based on the advice of counsel, Canady settled this claim for $5,000.

Before filing her complaint in this case, Canady filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming that she had been terminated because of her age and because of a disability arising from the knee injury she sustained in 2006.

Canady now insists that her suffering a workplace injury and filing a workers' compensation claim—not the issues surrounding her unauthorized paid vacation—were the real reasons for her termination. While Gillette was indisputably very interested in reducing, if not wholly eliminating, workplace accidents, Canady alleges that Gillette went so far as to have a policy of terminating anyone who suffered a recordable injury on the job. Canady further claims that members of Gillette management would lose their bonuses if there were any recordable accidents. This allegation, which Canady only corroborates with hearsay evidence,[1] directly contradicts statements from multiple members of Gillette's management team who indicated that bonuses, when paid, were based on overall performance and were not influenced by a single employee's accident.

## II.

We review a district court's grant of summary judgment de novo using the familiar *Matsushita-Anderson-Celotex* standard. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012).

---

[1] In her Response in Opposition to Gillette's motion for summary judgment, Canady supports her contentions by pointing to her own deposition testimony. This testimony, however, is based only on "general knowledge," "word of mouth," and "people talking in safety meetings and stuff" and thus is inadmissible hearsay. *See generally* Fed. R. Evid. 802. Canady does not offer probative admissible information from other sources to corroborate her allegations regarding firing and bonuses.

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support this argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). We view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We do not weigh evidence, assess credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which it must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party may not "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 586). The party opposing summary judgment must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson*, 477

U.S. at 248-52. If there are no disputed material facts, we review de novo whether the district court properly applied the substantive law. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2003).

III.

Tennessee recognizes a narrow exception to the employment-at-will doctrine that provides a common law cause of action for retaliatory discharge based on an employee's claim for workers' compensation benefits. *Anderson v. Std. Register Co.*, 857 S.W.2d 555, 556-59 (Tenn. 1993) *vacated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010); *Harney v. Meadow Brook Nursing Center*, 784 S.W.2d 921, 922 (Tenn. 1990). The Tennessee Supreme Court has "emphasized that the exception to the employment-at-will doctrine must be narrowly applied and not be permitted to consume the general rule." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 n.3 (Tenn. 1997).

When reviewing a Tennessee law retaliatory discharge claim, we employ a tripartite framework. *See Hale v. ABF Freight Sys. Inc.*, 503 F. App'x 323, 333 n.7 (6th Cir. 2012). First, the plaintiff employee bears the burden of establishing a prima facie case by proving: (1) the plaintiff was employed by the defendant at the time of an alleged injury; (2) the plaintiff sought workers' compensation benefits from the defendant;[2] (3) the defendant terminated the plaintiff; and

---

[2] Under Tennessee law, a plaintiff need not have actually filed a workers' compensation claim to have "sought workers' compensation benefits." *See Elliott v. Blakeford at Green Hills*, No. M2000-00365-COA-R3-CV, 2000 WL 1817228, at *4 (Tenn. Ct. App. Dec. 13, 2000) (stating that the court's declining to define the exact steps necessary to "have sought workers' compensation

(4) the plaintiff's claim for workers' compensation was a substantial factor in the defendant's motivation to terminate the plaintiff's employment. *See Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 800 (Tenn. 2010); *Anderson*, 857 S.W.2d at 558. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for plaintiff's termination. *Anderson*, 857 S.W.2d at 559.

If the defendant provides a legitimate non-retaliatory reason for termination, the burden shifts back to the plaintiff to produce "additional compelling evidence of pretext by showing specific, admissible facts, which realistically challenge the defendant's stated reasons for its actions." *Thayer v. Tyson Foods, Inc.*, 355 F. App'x 886, 889 (6th Cir. 2009) (internal citations and quotation marks omitted); *see also Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986). The plaintiff must overcome the defendant's proffered non-retaliatory reasons by showing "that the [defendant's] reasons have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." *Davis v. Reliance Elec. Indus. Co.*, 104 S.W.3d 57, 63 (Tenn. Ct. App. 2002) (quoting *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 652 (Tenn. Ct. App. 2001)).

---

benefits . . . was not an oversight" and that "keeping that requirement flexible protects the employee from an employer who might be tempted to evade the law by obstructive tactics or by discharging her before she can take any specific steps."); *accord Whirlpool Corp. v. Pratt*, No. M2007-02534-COA-R3-CV, 2008 WL 4615709, at *4-5 (Tenn. Ct. App. Oct. 17, 2008).

A.

Because Gillette does not challenge the first three elements of Canady's prima facie case, we begin our analysis at the fourth element—whether Canady's workers' compensation claim was a substantial factor in Gillette's motivation to terminate her employment. For Canady's workers' compensation claim to be a "substantial factor" under this final element, it must have been important or significant but need not be the sole or exclusive reason for Canady's discharge. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 396 (Tenn. Ct. App. 2006). "Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury." *Anderson*, 857 S.W.2d at 558-59.

Canady must show either direct or circumstantial evidence of a causal connection between her workers' compensation claim and Gillette's terminating her. *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992); *see also Reed v. Alamo Rent-a-Car, Inc.*, 4 S.W.3d 677, 684-85 (Tenn. Ct. App. 1999). "If an employee elects to shoulder this burden with circumstantial evidence, the employee must present direct and compelling circumstantial evidence." *Newcomb*, 222 S.W.3d at 391 (quoting *Caldwell v. Nissan Motor Mfg. Corp., U.S.A.*, 968 S.W.2d 863, 865 (Tenn. Ct. App.1997)).[3] Such evidence may include:

---

[3] The notion of "direct . . . circumstantial evidence" is oxymoronic because circumstantial evidence is necessarily not direct. The case in which this statement first appeared, *Caldwell v. Nissan Motor Mfg. Corp., U.S.A.*, 968 S.W.2d 863, 865 (Tenn. Ct. App.1997), supported it by citing *Thomason*, 831 S.W.2d at 293. The *Thomason* court's phrase, however, was "by direct evidence (as where the employer has an established policy or where the employer admits the reason for the

- 15 -

the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

*Id.* Although she acknowledges the significant overlap with the *Newcomb* criteria, Canady advocates applying the standard recently articulated in *Sykes v. Chattanooga Housing Authority*, 343 S.W.3d 18 (Tenn. 2011), where the Tennessee Supreme Court addressed causation in a retaliation claim under the Tennessee Human Rights Act. The *Sykes* court stated that

[c]ircumstantial evidence that is pertinent and probative on the issue of causation and retaliatory intent includes, but is not limited to, (1) temporal proximity of the adverse action to the complaint; (2) a pattern of workplace antagonism following a complaint; (3) an employer's failure to adhere to established company policy in dealing with the employee; (4) discriminatory treatment when compared to similarly situated employees; (5) evidence of a good work history and high or solid performance evaluations of the employee; (6) sudden and marked changes in an employee's performance evaluations after the exercise of the employee's protected rights; and (7) evidence tending to show that the [employer's] stated reason for discharge was false.

*Id.* at 29-30 (internal quotation marks and citations omitted). Temporal proximity does not necessarily establish that the claim was a substantial factor leading to the employee's termination. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995); *accord Sykes*, 343 S.W.3d at 31 (stating that demonstrating temporal proximity does not automatically entitle a

---

termination[]] **or** by compelling circumstantial evidence." *Id.* (internal citations omitted) (emphasis added). Thus, the standard is best understood as requiring compelling circumstantial evidence.

plaintiff to a trial). A plaintiff's "subjective beliefs or speculation are insufficient to create the requisite causal relationship." *Reed,* 4 S.W.3d at 685.

B.

Because Canady lacks direct evidence, she must present compelling circumstantial evidence that her workers' compensation claim was a substantial factor leading to her termination. Even analyzing Canady's claim under *Sykes*, her preferred framework, and drawing all reasonable inferences in her favor, we hold that Canady has not established a prima facie case of retaliatory discharge. Canady cannot point to specific, non-speculative evidence in the record sufficient to establish that her workers' compensation claim was a substantial factor in Gillette's decision to terminate her employment.

1. Temporal Proximity

Canady's substantial factor argument leans on the temporal proximity between her claim and her discharge. Canady's temporal argument, however, falters because the investigation into Canady's taking vacation without approval began before Canady's injury. According to Watkins's testimony, during the week before Canady's injury, he noticed Canady's unapproved vacation, spoke with Swafford, and alerted Baskerville that he would be investigating. Canady's only response is that Watkins is lying. She supports this claim by pointing to a lack of documentation of the conversation between Watkins and Swafford to claim that it never happened and by arguing that

Watkins should have questioned her the day before her injury. Such argument does not rise above mere speculation. The short, twenty-four-day time frame from Canady's first unauthorized vacation day until her termination likewise cuts against her temporal proximity argument. In this case, the temporal proximity between Canady's injury and discharge gives rise to little, if any, inference that Canady's workers' compensation claim substantially factored into Gillette's decision to terminate her. *See Conatser,* 920 S.W.2d at 648.

## 2. Workplace Antagonism

Canady next argues that she suffered workplace antagonism after her injury. To support this claim, she provides three pieces of evidence: (1) Rinks's blaming her for her injury; (2) Watkins's requesting a drug screen; and (3) Grimes's appearing angry when the investigation into Canady's injury indicated that she was not at fault. This last piece of evidence suffers from two flaws. First, it is uncorroborated, and second, a supervisor's apparent irritation does not amount to workplace antagonism. Similarly, although Watkins testified that he was not "sure" that a drug screen was a part of Gillette's post-accident policy, he also testified that he "thought that was the procedure" and that a drug screen was "typical anytime there's an injury to ensure you rule that aspect out." Watkins's comporting with what he believed to be company procedure does not indicate workplace antagonism. Finally, although Rinks—a non-managerial employee who had no input on the decision to terminate Canady—did initially suggest that Canady caused her own injury, he eventually

subscribed to the finding that Canady was not at fault. None of these claims of workplace antagonism provide compelling circumstantial evidence. *See Newcomb*, 222 S.W.3d at 391.

### 3. Failure to Adhere to Established Company Policy

Canady claims that Gillette failed to adhere to its own policies in its dealings with her after her injury. To support this allegation, Canady asserts that Gillette ignored its usual practice of allowing ODLs to approve emergency vacation time in writing, orally, or through SAP and instead contrived the need for an emergency vacation form. The record is not completely clear regarding the avenues for approval of emergency vacation. This uncertainty, however, is irrelevant because the record unambiguously indicates that Canady did not receive approval, regardless of the channels through which Canady could have received it. For her half day personal holiday on January 22, Canady attempts to circumvent this fact by asserting that she alerted a number of other supervisors of her departure. While true, this point remains unconvincing since Canady did not alert her ODL, Watkins, as she knew she should have and as required by Gillette's written policy. Canady's allegations that Gillette deviated from company policy fails to generate compelling circumstantial evidence of causation.

### 4. Discriminatory Treatment Compared to Similarly Situated Employees

Canady offers the conclusory assertion that "[i]n a nutshell, no other employee of Defendant was terminated for incorrectly requesting emergency vacation." Appellant's Br. at 38. Canady then

points to two examples of supposedly similarly situated employees who were not punished for rule violations: (1) an employee in the Cell Make, the other plant at the same Duracell facility, with a different supervisor who went unpunished after completing an emergency vacation form three weeks late; and (2) an employee who, five months after Canady's discharge, violated Gillette's lock-out/tag-out ("LOTO") policy but was not fired even though the stated penalty for a LOTO violation was immediate discharge. Neither of these examples are apt.

We have held that establishing the substantial factor element of a prima facie case by proving discriminatory treatment compared to similarly situated employees requires a comparator who "must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Ellis v. Buzzi Unicem USA*, 293 F. App'x 365, 372 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)). This standard undercuts both of Canady's examples. The employee who violated the LOTO policy had not engaged in the same conduct as Canady, and the employee who submitted his form three weeks late not only had a different supervisor but also worked in an entirely different plant. As such, this factor fails to establish that Canady's workers' compensation claim substantially factored into her discharge.[4]

---

[4] Moreover, Canady was assertedly terminated for misrepresentations during the investigation into her conduct. Canady, however, does not point to any other employees who made similar misrepresentations but were nonetheless not terminated.

## 5. Work History

Canady's only argument regarding her work history is to emphasize that she maintained an exemplary record during her thirty-five years at the battery plant. While true, this evidence is not particularly probative. Further, Canady's injury history undercuts her claim that she was discharged for suffering an on-the-job injury or filing a workers' compensation claim. Both before and after Gillette purchased the plant where she worked, Canady suffered a number of workplace injuries that resulted in workers' compensation claims, including a $10,000 claim for a knee injury (the same injury on which she based her disability claim in her EEOC charge) in 2006. She was not punished for any of these claims. Outside of her uncorroborated speculation about Gillette's having a recent policy of firing employees who suffered recordable injuries or her injury causing plant management to lose their bonuses, Canady fails to explain why her February 8 injury and subsequent claim differ from any of her previous injuries and claims. Canady's claim history, if anything, militates against the suggestion that her injury played a substantial role in Gillette's decision to terminate her employment.

## 6. Sudden and Marked Changes in Performance Evaluations

Regarding her performance evaluations, Canady argues that nothing in the record indicates that she had ever been accused of lying or falsification before she received her Corrective Action Summary Form on February 10, 2010, two days after her injury. While true, this evidence is not

particularly compelling proof that her workers' compensation claim was a substantial factor in her discharge.

### 7. Evidence Tending to Show that Gillette's Stated Reason for Discharge Was False

Canady struggles to collect evidence that either of Gillette's stated reasons for her discharge were false. Although she undoubtedly disagrees with the label of "falsifying documents," Canady does not contest that she engaged in the underlying conduct that led to this accusation—coding her absences as a half day of personal holiday and a full day of emergency vacation time without receiving approval from Watkins. Thus, while Canady may contest that this reason for her discharge was not a valid one, she cannot claim that it is false.

Canady likewise struggles to offer evidence that the second stated reason for her discharge—lying during the investigation—is false. Canady insists that she never claimed that Haun or Barber approved her vacation time. Yet Canady's only counter to Grimes's notes from their meeting on February 9, which indicate that she had claimed that Haun approved her vacation, is to allege that Grimes is lying or that Grimes's notes have been "altered *post facto.*" Appellant's Br. at 40. This claim of fabrication or alteration is speculative and unsupported in the record; it is not compelling circumstantial evidence indicating that Canady's workers' compensation claim significantly factored into her discharge.

C.

Canady falls short of presenting the "compelling circumstantial evidence" necessary to establish a causal connection between her workers' compensation claim and her termination. *Newcomb,* 222 S.W.3d at 391. Canady thus fails to make a prima facie retaliatory discharge case. Gillette therefore has demonstrated an absence of evidence to support Canady's case and is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

IV.

Accordingly, for the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to Gillette on Canady's retaliatory discharge claim.